**UNION TANK CAR COMPANY**

v.

**GENERAL TRUCK DRIVERS, WARE-HOUSEMEN & HELPERS OF AMER-ICA, LOCAL UNION NO 5.**

**Civ. A. No. 67–63.**

United States District Court,
E. D. Louisiana,
Baton Rouge Division.

Jan. 30, 1970.

Richard M. Lyon, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., Andrew C. Partee, Jr., Kullman, Lang, Keenan, Inman & Bee, New Orleans, La., for plaintiff.

William C. Bradley, Baker, La., for defendant.

WEST, Chief Judge:

This action was brought by Union Tank Car Company for damages sustained by it by virtue of an alleged breach of a collective bargaining contract on the part of defendant, General Truck Drivers, Warehousemen & Helpers of America, Local Union No. 5. The contract at issue extended from June 24, 1964 through June 23, 1967. The case falls generally into two aspects. The first involves events which allegedly occurred within the Company's Baton Rouge plant prior to May 1, 1967. The second aspect involves a strike against the plant beginning May 1, 1967 and continuing until January 29, 1968. The Company alleges that the activities of the Union both prior to and during the strike were in derogation of the above mentioned contract and that by reason of such activities the Company incurred certain losses and damages for which it now seeks recovery. The case was tried to the Court without a jury on November 18 and 19, 1968, and was submitted, subject to the filing of briefs by both parties. The evidence adduced during the trial reveals the following facts.

The situs of the activities which gave rise to this suit is the Union Tank Car plant north of Baton Rouge, Louisiana. The design of the plant is that of a geodesic dome with an interior approximately the size of a football field. The office and storage area is in the center and the operational area, where the work of repairing and reconditioning tank cars is performed, is around the inside perimeter of the dome on the ground level. In January of 1967, when the events at issue began, the plant employed 64 employees, of which 51 were members of defendant Union. The balance of the employees were supervisory and clerical personnel.

The specific provisions of the contract which plaintiff contends were breached by the conduct of defendant and its agents are as follows:

Article XI.

Section 2. A grievance is a difference of opinion between the Company and an employee or group of employees or between the Company and the Union, with respect to the meaning, interpretation or application of the terms of this Agreement. A grievance must be presented to the Company within five (5) working days after the occurrence of the event giving rise to the grievance, or it shall be considered waived.

Section 3. (a) Either party shall have the right to have the aggrieved employee present at any step of the grievance procedure hereinafter set forth. If the grievance involves a group of employees, either party shall be entitled to have one employee from the group present at any step of the grievance procedure hereinafter set forth.

(b) A grievance shall be handled in the following manner:

STEP 1: If the employee cannot settle the grievance informally with the immediate supervisor involved, the employee's Grievance Committeeman shall reduce the

grievance to writing and present it to the immediate supervisor within the period specified in Section 2 above. The Supervisor shall give the Grievance Committeeman his answer without delay, but no later than the work day after the day he receives the written grievance. If this answer does not settle the grievance, the written grievance shall be presented to the Plant Manager within two (2) working days after the Grievance Committeeman has received the immediate supervisor's written answer.

STEP 2: Within two (2) working days after the Plant Manager has received the written grievance, the Plant Manager or his designated representative shall meet with the Chairman of the Grievance Committee in an effort to settle the grievance. If the grievance is not settled at such meeting, the Plant Manager shall give the Chairman of the Grievance Committee his written answer to the grievance within five (5) working days after the meeting. If the Union so elects, a member of the Grievance Committee other than the Chairman may represent the Union in this Step.

STEP 3: If the grievance is not settled at the meeting in Step 2, either party may, within ten (10) working days after the meeting in Step 2 notify the other party in writing of its desire to submit the matter to arbitration before a Board of Arbitration consisting of one (1) member appointed by the Union, one (1) member appointed by the Company, and an Impartial Chairman. Each party shall notify the other within two (2) working days after notice of desire to arbitrate has been given of the name of the person selected as its representative on the Board of Arbitration. The Company and the Union members of the Board of Arbitration will attempt to agree upon an Impartial Chairman; but if they fail to do so within five (5) working days, after they first confer for this purpose, the Impartial Chairman will be selected from a list of five (5) names submitted by the Federal Mediation and Conciliation Service. The Company and Union members of the Board of Arbitration shall alternately strike names from such list until only one (1) name remains, and the remaining name shall be that of the Impartial Chairman. The Board of Arbitration shall have authority only to interpret and apply the terms of this Agreement and to decide the particular dispute submitted to it. If the parties are unable to agree upon a statement of the issue to be decided by a Board of Arbitration, a majority of the Board of Arbitration may determine the issue to be decided on the basis of the respective positions and arguments of the parties. The Board of Arbitration shall not have authority to extend, modify, suspend or in any way

change any of the provisions of this Agreement. The decision of a majority of the Board of Arbitration shall be final and binding upon the Company, the Union and the employees. The fees and expenses of the Impartial Chairman shall be borne equally by the Company and the Union.

Article XIII.

Section 1. During the term of this Agreement the Union agrees that neither it nor the employees covered by this Agreement will engage in any strike, walkout, slowdown, sitdown, picketing or other interference with the operations of the Company; but it shall not be a violation of this Agreement for the Union and the employees covered by this Agreement to engage in a strike caused by the refusal of the Company to abide by an arbitration award issued pursuant to Article XI of this Agreement.

The Plaintiff contends that both the pre-strike activities of the employees and the strike itself were acts of the Union and that both of these actions are prohibited under the contract provisions above quoted. By an overwhelming preponderance of evidence adduced at the trial of this case, the following chronology of some of the pertinent events involved was established.

On Friday, January 6, 1967, Joseph Caldwell, the new plant manager for the plaintiff's Baton Rouge plant, called the shop steward, Emile Verbois, into his office to officially make his acquaintance and to outline contemplated changes in administrative procedures to be used at the plant. Verbois inquired as to whom he should contact in the company's home office in Chicago in the event that he and Caldwell could not agree on an issue. Caldwell informed Verbois that he, Caldwell, was plant manager and that Verbois would deal directly with him. Verbois then stated that he hoped Caldwell lasted longer than the previous twelve plant managers, thereby setting the stage for coming events.

On January 10, 1967, the fireworks (literally) started. On that day there were approximately 15 explosions of firecrackers in the plant building. The dome construction of the plant tends to make even normal noises within the plant more intense. Regarding the effect of these explosions Caldwell testified:

Q. Now, could you determine from the sound what it was?

A. Yes, it was a very distinct powder explosion.

Q. And now, within the dome, when an explosion like this goes off, can you describe for the court the sort of effect it has?

A. Yes, of course, it sounds—if one is ever around a bell, a steeple bell and if you put your head in right there and taking the clapper and hitting the side and all of it comes right back at you like a tremendous—it has a tremendous effect.

On that same afternoon Caldwell found a live opossum on the steering wheel of his car. It was necessary to kill the opossum to remove it from the car. The following day Verbois asked Caldwell if he had to kill the opossum with a gun.

On either January 10th or 11th, all four tires were punctured on a car belonging to Clyde Torey, a plant supervisor. Following these occurrences Verbois informed Caldwell that the shop would never get in order as long as Torey and another supervisor, McLaren, worked on the supervisory staff.

Due to the trouble he was having with his tires, Torey began riding to work with Phillip Dimattia, a maintenance man at the shop, who was a member of Local #5. Dimattia immediately began having an inordinate number of flat tires (fourteen in all). Later, when

Torey quit his job at the plant and hence ceased riding with Dimattia, the flat tires no longer occurred.

On or about January 26th, Caldwell hired a guard service to watch the parking lot to prevent reoccurrences of such tampering with vehicles in the lot. Verbois objected to the presence of the guards and this matter later became an item of contention.

On Friday, January 27th, a snowstorm in Chicago prevented the home office from getting the necessary payroll information to Caldwell and consequently he was unable to pay the employees that day as scheduled. At noon Caldwell informed Verbois of this fact. Firecrackers were exploded in the building the rest of the day. After work all the hourly employees met Caldwell in the employee lunchroom. Verbois demanded overtime from then until the employees were paid. Caldwell was prepared to offer an explanation for the delay in issuing the pay checks, but some of the employees told him that they did not want to hear it. Caldwell then posted the explanation on the bulletin board, left the lunchroom, and met with the supervisors in the conference room across the hall. Shortly thereafter Verbois came in and asked Clyde Torey to come across the hall to the lunchroom. Caldwell followed the two of them to the lunchroom where he heard Verbois threaten Torey. Caldwell testified as follows:

Q. And what took place in there?

A. Mr. Verbois was talking to Mr. Torey, "What the hell are you grinning for, you son of a bitch? This is not a laughing matter." Of course—

Q. What did Mr. Torey say?

A. Mr. Torey said that he was not grinning at them; he did not think it was funny, because he didn't get paid either and he needed his money as well as they needed theirs, and he was not laughing at them. Of course, all of these back-up people were saying, "Yes, you were, you were grinning. We'll get you when you come out the gate, you son of a bitch."

Q. Who said that?

A. Well, Emile told Torey this, "We'll work you over."

Q. What else was said? If anything.

A. He just continued to say that "We'll be waiting for you out at the gate; you'll never make it home alive."

Torey then called the sheriff's office and asked for protection so that he might return home. Though he waited approximately two hours, the protection never came. This incident was the last straw for Torey and he left his job, not to return until 1968, when Local #5 and Emile Verbois were no longer at the plant.

On February 1, 1967, Verbois and McLaren were waiting at the gate to the plant when Caldwell came to work. The guard was not at the gate as he should have been. Verbois and McLaren told Caldwell that there had been a shooting. Verbois said that if Caldwell didn't fire the guards that he, Verbois, would "pull a strike." Caldwell said he would have to investigate prior to taking any action whereupon Verbois told Mustin, another employee, to go inside and pull everyone off on strike. Mustin and Verbois then shouted to all the employees that they were all going on strike. Approximately one-half of the employees obeyed this command and ceased working. Caldwell was then called on the phone by Verbois who informed him that Ed Partin, Business Manager of Local #5, wanted to speak with him. Partin told Caldwell that if he did not discharge the guards then he (Partin) would get guns and walk through the plant. Verbois added that Caldwell was a "damned communist" and that he should be put across the hood of a car and have the hell beat out of him. After discussing the matter of the guards at length, Partin assured

Caldwell that the incidents would cease if the guard service was terminated. Caldwell agreed to this and the guards were discharged.

On February 6th, a supervisor from Chicago came to the plant to inspect some equipment. This was the occasion for several firecracker explosions inside the building. The same day Verbois complained to Caldwell that the pay of some of the men working under the repair supervisor, Doyle Kelleher, was not being computed on the correct basis. Instead of filing a grievance as called for in the contract, Verbois told Caldwell that "they could all go to hell" and that the company was stealing from these people. Soon thereafter Kelleher reported that he was being harassed. On more than one occasion itching powder was put in his pants, a baby bottle and some pictures were placed on his desk and he was peppered with some kind of pellets.

On February 10th, Verbois told Caldwell that he was going to declare a truce for one week to show that they could be decent people to work with. For one week there were no incidents in the plant; an impressive demonstration of the amount of control wielded by Verbois over the internal discipline of the group. One week from the declaration of truce by Verbois, Caldwell returned from lunch to find a baseball-size hole in the window of his office, a steel ball made of two rivet heads welded together on the floor of his office, and an imprint of the same steel ball on the wall opposite the broken window. Phillip Dimattia testified that, just prior to the time the window was broken, he saw Verbois and two other employees, Sanchez and Hall, walking toward the boiler maker area, which is that part of the operational area which faces the window to Caldwell's office. Dimattia stated that Verbois had a "bazooka type piece of pipe" in his hand. The function and purpose of this apparatus was described by Dimattia as follows:

Q. You described this as what the employees called a bazooka?

A. Yes, sir.

Q. Have you seen more than one of those at the plant?

A. Yes, they had some different versions of it, but I don't see them nowhere around. Some longer than that, with one handle on it.

Q. Now, what were these used for, Mr. Dimattia?

A. Well, what I saw, they taken and inserted a firecracker, unscrewed the cap inserted a firecracker in it, screw the cap back on, and then drop a hex nut in it and then somebody would light that firecracker and they could aim it anywhere they wanted it.

Q. Have you ever seen it shot?

A. Several times.

Q. Have you ever seen it shot inside the dome?

A. Several times.

Q. By whom?

A. By Emile. [Verbois]

Caldwell talked to Verbois about the incident and gave him a written warning. Caldwell also told Verbois that the harassment and reduced production at the Baton Rouge plant would cause the company to divert work to other shops and consequently that nine men would be laid off.

The following Monday, February 20th, Kelleher was shot in the chest with a bolt while walking into the plant. Concerning this incident Caldwell testified on direct examination:

Q. Was there any incident involving Mr. Kelleher on that day?

A. On that following Monday morning, he came into the dome or at least he reported this to me after I arrived—that as he was walking in the dome and in fact he was very upset—he said, "As I was coming in the dome somebody shot me. I think it was this." And he showed me a bolt. I asked, "Well, where did they shoot you?" He showed me on his chest, a great big bruised spot already

where this object had struck him in the chest. I asked him, "Did you see who did it?" He said, "No, it was still to[o] dark. I think it came off of the top of that office building up there, I'm not sure." And he said, "I'm going to leave; I just can't take it any more; it's too much. I have had too much harassment; it's not worth it. Life's too short. I've got to go to the doctor for my chest; it hurts bad."

Q. All right, and what happened to Mr. Kelleher next?

A. He went home.

Q. When did he return?

A. About six weeks or so later. A number of weeks, I don't remember the exact time.

On the same day Caldwell attempted to introduce Mr. Hood, a new maintenance supervisor, to Verbois. Verbois declared that he wouldn't dirty his hands on a man who was a friend of Caldwell's.

On February 24th, the effective date of the layoff of the nine men, there were many explosions in the plant. That same day one of the plant employees who was not a member of Local #5 found the hood of his truck up and a sticky molasses-type substance around the oil fill pipe. Caldwell had his maintenance supervisor take the engine apart and clean it up. Shortly thereafter three other cars belonging to clerical and supervisory personnel had the engines locked up due to a foreign substance in the oil or gas. The company paid for repairs to these cars. On another occasion one of this same group of employees found his engine oil pan unplugged and all the oil drained out.

Due to the decreased production caused by the continued harassment at the plant, two additional men were laid off. On the day of the layoff, March 10th, about one-half of the work force did not report to work. Various reasons were given such as illness, personal business, and "one day's vacation." That same morning Partin called Caldwell and asked to meet with him. The parties met at a local motel where Partin indicated a desire to settle these problems and get the laid off men back to work. Caldwell stated that the men would not be rehired until the incidents at the plant ceased. Partin then indicated that such an attitude would get them no place and stated that "We've run bigger men than you out of Baton Rouge." The parties scheduled another meeting for the following morning in order to give Caldwell an opportunity to check with his supervisors regarding the rehiring of the laid off men. Partin did not show up for the meeting the following morning but he did meet with Caldwell the next Monday. Partin then agreed to certain items of understanding between the company and the union and further agreed to come to the plant the following day in order to read this agreement to the employees. It is significant to note, however, that Partin refused to agree to an item proposed by Caldwell which stated in substance that Emile Verbois should be terminated if further violence occurred at the plant.

The following day Partin read the items to the employees at the plant and, pursuant to the agreement, Caldwell rehired the nine men who had previously been laid off and suspended the termination of the two other men which was pending at the time. For some time after this meeting the specific incidents of harassment ceased but a general slowdown in production continued. About a week after Partin spoke to the employees at the plant Caldwell hired five additional men. They all resigned within three or four days due to harassment from the other employees. When Caldwell informed Partin over the phone that the men had been run off, Partin proposed a meeting but despite repeated attempts, Caldwell was unable to get in touch with Partin after this conversation.

Following the resignation of the five new employees the slowdown became much worse.

Some time during the latter part of April Caldwell witnessed Verbois cursing Phillip Dimattia, and telling Dimattia that if he did not quit working with management then Verbois was going to pull his card and get him for it.

A short while later George Wisman, a new maintenance supervisor, reported to Caldwell that he was being followed home by union members.

By the end of April Caldwell had had enough. Verbois was terminated on May 1st. Within minutes after Verbois was notified of his termination, all the lights in the plant went out due to the switch having been pulled. Soon after this all the hourly employees ceased work and left the plant. Mr. Dimattia testified as follows regarding the reasons for the walkout:

Q. Now, Mr. Dimattia, did you go on strike on May 1, 1967?

A. No.

Q. Did you leave your work on that day?

A. Yes.

Q. How did you leave your work?

A. Well, they had a disturbance around there and we all met in the lunch room and they were talking about going out in protest of Mr. Caldwell firing Emile Verbois. Several of us didn't want to go out, and there was trouble around there and we were ascared there would be a big fight or something like that, so we agreed rather than see all that go on, we would agree to walk outside.

Q. All right. During this discussion in the lunch room, did Mr. Emile Verbois say anything that you heard?

A. Well, all he said, "We'll go outside and call Ed Partin and he come to the gate and we'd be back to work in five minutes time."

Joseph Martinez, a tank repairman for Union Tank, testified Verbois told a group of employees in the lunchroom that he (Verbois) had been fired, "For trying to represent a man," and that they were all going out to the front gate. Martinez further stated that, rather than see any bad feelings on the job he went along with the others to the gate in order to "see what Local #5's decision would be."

Joseph Polozola, another employee of Union Tank, testified as follows regarding the circumstances surrounding the events of May 1st:

Q. Now, how did you yourself first hear about the strike?

A. Well, Emile told me himself. It was May first, approximately noon and he came by where I was working, he just came by with two or three other fellows and at that time, if I remember, it was our first day on daylight saving time and we didn't have the whistle blowing at the correct hours. I had a burning torch in my hand and Emile come by he took the torch and he dropped it and he said, "Get your damned ass out of here, let's go upstairs, get your clothes, we are going out to the gate. We're going to have a meeting with Mr. Partin." He said something that he had just fired him and he went off.

Q. Did you do that?

A. Yes, sir, Well, I met a couple other men and we thought it over and we decided it was better for us that we should go out.

After the men left the plant they went to the plant gate to wait for Partin. The police then required them to leave the private property at the plant gate and move up to the public highway. Soon union officials Donice Bennett and Earl Jones arrived, took Verbois in their car and drove to the plant. Inside, they conferred with Caldwell and other representatives of the company. The union proposed that Caldwell allow Verbois to come back to work and use a grievance procedure under the contract to file a grievance with the union and thereby allow the union to decide if Verbois

should be fired. As Earl Jones testified at the trial:

Q. So the idea was, at first you said, "Put Verbois back to work and then men can come back to work" and then you could check with Mr. Partin to see if Mr. Verbois should be fired. Was that your first proposal?

A. I believe that is right.

In return for this action by the company the union would get all the men back to work immediately. Caldwell declined the union's offer because under the collective bargaining agreement the grievance procedure was available to the union only. Caldwell suggested that all the men except Verbois return to work and that Verbois use the grievance procedure to process his grievance regarding his termination. The union refused. Finally the union officials left with the remark, "We'll have to report back to Mr. Partin and will be back in touch with you." During this conference neither Jones nor Bennett repudiated the actions of the strikers in walking out in violation of the contract.

All the evidence adduced was to the effect that the strike was called because of Verbois' discharge. His reinstatement was a condition insisted on by the union officials before they would order the strikers back to work. Plainly stated, the union's proposal was that the company surrender to Partin the decision on whether or not Verbois should be discharged. The union's position at the trial was that it was helpless to prevent the employees from striking over Verbois' discharge. If this was true then their offer to Caldwell could not, of course, have been in good faith because no matter who decided the issue of whether or not Verbois was discharged, if he was again discharged then the employees would again walk out.

On the night of May 1st, a general meeting of all members of Local #5 was held at the Union Hall. Partin told the men that they had a contract with Union Tank and they expected to live up to it.

However, Verbois told the Union Tank employees that a picket line was going up and they had better not cross it if they knew what was good for them. Eugene Paxton asked Verbois specifically if other employees could cross the picket line and Verbois replied, "If you want to take the chance of physical violence." Verbois also said that Partin was going to be "unavailable" to the company for a while. The picket line was up the next day.

Jack Cunningham, Vice President of Car Repairs and Maintenance for the company, came to Baton Rouge on May 2nd and tried to contact Partin. He was unavailable as Verbois had predicted. On May 4th or 5th, after returning to Chicago, Cunningham finally talked to Partin. Partin stated that he was not aware that a strike was in progress. When confronted with the fact of having made statements to the local newspapers and having sent two union officials to the plant, Partin conceded that he was aware of the strike but insisted that, although the company attorney had notified him, he did not have "official" notification from a company official. Consequently Cunningham had Caldwell "officially" notify Partin of the strike. The company filed charges with the National Labor Relations Board, alleging that the union conduct amounted to an unfair labor practice. On May 10th, Partin sent a telegram to Cunningham stating that the union did not authorize the strike and that it would notify the employees that if they did not return to work then they would be subject to discharge. This telegram contained no indication that the union would take affirmative steps to return the employees to work.

On May 11th, this suit was filed. When Partin learned of the suit he called Cunningham in Chicago, and, after cursing Cunningham in a vile and obscene manner, inquired of Cunningham what he (Partin) should do. Cunningham replied that there was no evidence that Partin had attempted to get the employees to return to work. Partin

claimed that he did not have the addresses of the employees and therefore he could not contact them. Cunningham had Caldwell furnish the addresses. Partin sent a letter to the employees informing them that the union was not sanctioning the picket line. The letter also stated that any employee who failed to return to work would be subject to discharge without protection from the union.

On May 12th, Partin sent a telegram to all Union Tank employees urging them to attend a meeting at the Union Hall the following Monday. At this meeting Partin told the men that anybody had a right to put up a picket line and demonstrate and he did not have a right to tell them to take it down. Partin said he had no more right to remove the picket line than if someone were picketing a supermarket. Joseph Martinez testified that Partin was asked by a union member if it was all right for them to cross the picket line. To this Partin replied, "If you get that yellow streak from down your back, maybe you can cross this picket line." At the outset of this meeting Partin sent a man into the back room to return with a pistol and a carbine which was placed on a table in front of Partin for all to see. Partin stated that they were for his protection and to insure that there was no trouble on union property.

The employees who testified at the trial agreed that Partin could have simply ordered the picket line removed and ordered the men back to work. Polozola said, "He could have just told them they were out of line, and they had to move." Martinez stated, "He said that is the way it should be done; he didn't tell us to do it."

One of the defenses to this action urged by the union is that, under the by-laws of the union, Verbois *could not* call a strike. Be that as it may, by conducting themselves as they did on May 1st and thereafter during the strike, the union officials clearly ratified Verbois' action in calling the strike. Further,

Section 12 of the by-laws of the union provides that it will be necessary to promptly remove a business agent who disregards the instructions of that section. That same section specifically provides that appointed business agents have no authority to call or terminate strikes. Section 13(b) charges the Executive Board with the duty to investigate any breach of fiduciary duty and take appropriate action. It is difficult to conceive of a more serious breach of fiduciary duty on the part of a steward than the calling of an unauthorized strike which results in shutting down a plant of the size here involved. In spite of the far-reaching consequences of his actions, no action was taken against Verbois by the union. In fact, not only was no action taken against Verbois, but he continued to represent the union in the negotiations toward a new contract.

There is little doubt as to the responsibility of the union for the actions of Verbois and the other men on the picket line. All the pickets were members of Local #5. The line was run by Verbois, agent of the local. It is significant to note that, during the course of the strike here at issue, Verbois was called on to testify in a different proceeding before this Court. In that case, John F. LeBus versus Teamsters Local #5, Verbois testified as follows on cross examination:

Q. Mr. Verbois, did you testify what your capacity was with the Teamsters?

A. I will accept the name the gentleman gave me a while ago of "Straw boss" of the picket line.

Q. You mean if it were not for Barber Brothers, you would not have any title with Teamsters Local Union #5?

A. No, sir; I have also a picket line up at Union Tank that has been up since May first.

Q. During the time of the picketing, or during the time that you were supervising the picketing going on

at Barber Brothers, did you do any picketing up at Union Tank?

A. Well, I have my line up at Union Tank.

Q. You keep both lines running?

A. Yes, that's right.

Thus it is clear that during the course of this strike Verbois was working for the union only and was its agent. The United States Fifth Circuit Court of Appeals made this same finding upon examination of substantially the identical facts in the case of General Truck Drivers, Chauffeurs, Warehousemen and Helpers of America, Local No. 5 v. N. L. R. B., and Union Tank Car Company, Intervenor, 5 Cir., 410 F.2d 1347. In that case the Fifth Circuit said:

> We are convinced that substantial evidence in the record as a whole supports the Board's findings that the Union, by virtue of the conduct of Verbois and others acting in its behalf, was responsible for the picket line in violation of the Act, * * *.

In summary, there is no doubt but that plaintiff, Union Tank Car Company, in the course of its business produces goods and performs services for industries and businesses engaged in interstate commerce and such goods are used in the transportation of other goods in interstate commerce. Plaintiff is, in fact, engaged in an industry affecting interstate commerce. There is also no doubt but that the defendant, General Truck Drivers, Warehousemen and Helpers of America, Local Union #5, is an unincorporated labor organization representing employees in industries affecting interstate commerce, having its principal domicile in the City of Baton Rouge, State of Louisiana, within this district. The plaintiff and the defendant were parties to a collective bargaining agreement which was in effect from June 24, 1964, until June 23, 1967. This contract provided for a complete grievance procedure whereby differences of opinion regarding interpretation of any part of the contract were to be resolved. The agreement in Article XIII, Section 1, prohibited the defendant union and/or any of the employees from engaging in any strike, walkout, slowdown, sitdown, picketing or other interference with the operations of the company. From the facts adduced during the trial of this case, there can be no doubt but that Emile Verbois, an employee of the plaintiff, was shop steward and assistant business agent of the defendant union from June 22, 1961 until May 1, 1967, and that from May 1, 1967 through January 29, 1968, Emile Verbois continued to act for the union in the capacity of assistant business agent. From January 1, 1967, until the commencement of the strike on May 1, 1967, the defendant union, through its agents and members, engaged in various acts, as hereinbefore partially set forth, calculated to harass and terrorize the plant officials and other non-union employees of Union Tank Car Company, and to slow down or stop production at the Union Tank Car Company plant, all in violation of the collective bargaining agreement in full force and effect at the time, which said actions resulted in damage to the defendant as hereinafter set forth.

On May 1, 1967, the events of the preceding four months culminated in a strike at the Union Tank Car Company plant, with an attendant complete work stoppage, which lasted until January 29, 1968. There is simply no doubt but that this strike, which was in direct violation of the collective bargaining agreement which was in effect at the time the strike was called, was called, sanctioned, fostered, and approved by the defendant union, and there is no doubt but that the strike, even though it extended beyond the termination date of the collective bargaining agreement, was a strike by the union in violation of its contract with the plaintiff company and was, for its entire duration, a strike by the defendant union against the plaintiff company. And there can be no doubt but that the damages hereinafter referred to and suffered by Union Tank Car Company during the period May 1, 1967 to

January 29, 1968, were occasioned by the illegal strike by the defendant union against Union Tank Car Company. This strike was called on May 1, 1967 by Verbois, with the obvious blessing of the other union officials, to protest, apparently, the firing of Verbois, and without recourse to the grievance procedures set up in the collective bargaining agreement, which did not expire until June 23, 1967. All of the participants in the strike were members of the defendant union, and the strike was actively supported, throughout its entire duration, by the officials and members of the union. It was a union strike in violation of the collective bargaining agreement in existence at the time the strike was called, and the union is responsible for all damages sustained by the plaintiff as a result thereof.

The fact that much of the damage sustained by the Union Tank Car Company was incurred after the expiration date of the collective bargaining agreement is of no moment. The fact is that the damage caused subsequent to May 1, 1967 was caused in its entirety by the illegal strike called for by the union on that day. Had the grievance procedure provided for in the collective bargaining agreement been used instead of resort being had to an illegal strike, there is every reason to believe that the damage incurred by the Union Tank Car Company between May 1, 1967 and January 29, 1968 would never have been incurred at all. Consequently, the illegal acts of the union in calling and perpetuating the strike during that time makes it legally responsible for the damages incurred thereby. See International Union of Operating Engineers Local 653 v. Bay City Erection Co., 300 F.2d 270, 273 (CA 5); W. L. Mead, Inc. v. International Brotherhood, etc., 129 F.Supp. 313 (D. Mass. 1955), aff'd 230 F.2d 576, 584 CA 1–1956); and Local 127, United Shoe Workers of America v. Brooks Shoe Mfg. Co., 298 F.2d 277 (CA 3–1962).

Thus, the damages to be awarded the plaintiff fall into two categories, i.e., those occasioned by the illegal actions of the union members prior to the calling of the strike, that is, from January 1, 1967 to May 1, 1967, and those occasioned by the strike itself, and arising between May 1, 1967 and the date of termination of the strike on January 29, 1968.

While it is obvious that the amount of damages sustained in a case of this nature cannot be ascertained to an absolute mathematical certainty, nevertheless they can and have been determined in this case with what this Court believes to be sufficient certainty to meet the ends of justice and to allow this Court to make an award of damages.

In Story Parchment Co. v. Paterson Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544, it was said:

> It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. * * * Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. [Citing cases.] As the Supreme Court of Michigan has forcefully declared, the risk of the uncertainty should be thrown

upon the wrongdoer instead of upon the injured party. * * *

The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery.

That principle is controlling in this case.

The general standard relative to recoverable damages in a case of this kind was succinctly stated in Wilson & Co. v. United Packinghouse Workers of America, 181 F.Supp. 809 (N.D.Iowa–1960) as follows:

> * * * In an action against a union under Section 301 for damages caused by a breach of a no-strike provision in a contract, the measure of damages recoverable is the actual loss sustained by the plaintiff as a direct result of the breach. * * * Such loss would be that which may reasonably and fairly be considered as arising naturally from the particular breach of contract involved and which may reasonably be supposed to have been in the contemplation of the parties at the time the agreement was entered into in the event of such violation.

Actual damages in this case should be measured as they were in the case of United Electrical, Radio & Machine Workers v. Oliver Corp., 205 F.2d 376 (CA 8–1953), wherein the trial court instructed the jury as follows:

> You will first determine the fair and reasonable amount of plaintiff's reasonably necessary fixed or standby overhead at or reasonably near the time of the violation of agreement upon which such Count is based. In making such determination you should determine what items of expenses were reasonably and properly allocable to such overhead and the fair and reasonable amounts of such allocable items. In making such determination you will exclude any items of overhead not reasonably necessary and any items of expense not properly allocable to such overhead.
>
> You will next determine what deprivation or loss of benefit, if any, of such reasonably necessary overhead may reasonably and fairly be considered as arising naturally from the particular breach of agreement involved and which may reasonably be supposed to have been in the contemplation of the parties at the time the agreement was entered into in the event of such violation. The amount of such deprivation or loss of reasonably necessary overhead as thus determined will constitute your award of damages for the violation of agreement in either Count.

The Court, in *Oliver*, then proceeded to define "overhead expenses" as follows:

> Overhead expense is the necessary cost incurred by a company in its operations which can not be easily identified with any individual product and which by accepted cost accounting procedure is spread over or allocated to the productive labor, which is labor performed in the processing of the company's products. Such expenses do not fluctuate directly with plant operations. They are expenses necessary to keep the company on a going concern basis and are based upon the company's production which is planned for a year in advance. They are constant regardless of fluctuations in plant operations. When productive labor in a plant is reduced for any period to less than the normal, the company sustains a loss in the expenditure of necessary overhead for which it receives no production.

Much evidence was introduced to show the overhead expenses and production figures of Union Tank Car Company for some five years preceding the difficulties here involved. There is no evidence to show any drastic variation in production figures at this plant during the past several years, but there is more than ample evidence to show drastic reductions in production during the four months preceding the strike which com-

menced on May 1, 1967, and, of course, a complete cessation of production during the entire period of the strike from May 1, 1967 to January 29, 1968. There is absolutely no evidence to show that these drastic reductions in production, while overhead expenses necessarily remain somewhat constant, were not caused directly by the union's illegal activities nor is there any evidence whatsoever to show that these damages were not foreseeable and even contemplated by the union.

█ The evidence in this case amply supports the conclusion that during the period January 6, 1967 to May 1, 1967, the total overhead expense of the Union Tank Car Company plant in Baton Rouge, Louisiana, as previously defined herein, amounted to $212,466. During that period, the evidence clearly shows, 31 per cent of these expenses were not returned to the company by production at the plant based upon the production level of the preceding year, which the Court concludes from the evidence is a fair, representative year. Thus, during the period January 6, 1967 to May 1, 1967, Union Tank Car Company was damaged in the sum of $65,863.46 as a direct and proximate result of the illegal activities of the defendant union.

There is no dispute as to the fact that during the period of the strike, from May 1, 1967 to January 29, 1968, there was, because of the strike, no production at the Baton Rouge plant, while necessary overhead expenses continued to accrue. After excluding all expenses and disbursements not directly attributable to overhead expenses necessary to continue the plant as a going concern in anticipation of the end of the strike, the evidence shows that during that period Union Tank Car Company incurred necessary overhead expenses in the amount of $180,077 for which they received no production at all. This loss of overhead expenses was also a direct and proximate result of the illegal actions of the defendant union. This Court therefore concludes, as a matter of law, that the plaintiff, Union Tank Car

Company, is entitled to recover from the defendant, General Truck Drivers, Warehousemen & Helpers of America, Local Union No. 5, the total sum of $245,940.46, together with legal interest thereon from date of entry of judgment until paid, and judgment will be entered accordingly.