**ADLEY EXPRESS COMPANY et al.**

v.

**HIGHWAY TRUCK DRIVERS AND HELPERS LOCAL 107.**

**Civ. A. No. 41262.**

United States District Court,
E. D. Pennsylvania.

Sept. 26, 1973.

Bernard J. Smolens, Martin Wald, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for plaintiffs.

Howard J. Casper, Davis, Casper & Muller, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This is a suit for damages arising out of breach of a no-strike clause of a collective bargaining agreement between Highway Truck Drivers and Helpers Local 107 (Local 107) and a large number of firms in the trucking industry in the Philadelphia area.[1] Plaintiffs are some eighteen trucking companies and two industrial concerns who were parties to the agreement. The events in question occurred between June 20 and June 25, 1965, and stemmed directly from a work stoppage that commenced on June 11, 1965, at the terminal of Roadway Express, Inc. (Roadway), whose employees were also represented by Local 107. The events occurring at Roadway have been detailed elsewhere and need not be repeated here.[2]

In an Opinion and Order filed on October 6, 1972, and reported at 349 F. Supp. 436, we granted partial summary judgment in favor of the plaintiffs. As the result of that Opinion and Order, it was established that: (1) the events occurring between June 20 and June 25 and the conduct of Local 107 during that period of time amounted to a strike in violation of the no-strike clause in the

---

1. Jurisdiction attaches under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The no-strike clause reads as follows:

   The Union and the Employers agree that there shall be no strike, lockout, tie-up or legal proceedings without first using all possible means of a settlement as provided for in this Agreement, of any controversy which might arise.

2. *See* Roadway Express, Inc. v. Highway Truck Drivers & Helpers Local 107, 299 F. Supp. 1058 (E.D.Pa.1969). That action resulted in a judgment of $970,000 against Local 107, which was subsequently settled for a lesser amount. Roadway is not a party to this action.

collective bargaining agreement; (2) the strike was against each of the plaintiffs; and (3) the strike continued from 12:01 a.m. on June 21, 1965, until June 26, 1965. We refused to grant summary judgment on the one remaining element necessary to establish liability, *i.e.*, whether Local 107 remained in breach of its collective bargaining agreement throughout the period of the strike, and ordered that remaining liability issue be severed from the trial on damages. On January 8, 1973, a jury trial having been waived, we tried that remaining issue and now adjudicate it in this Opinion, which constitutes our findings of fact and conclusions of law under Fed. R.Civ.P. 52(a). Because of the unusual nature and many ramifications of the case, even before reciting our findings of fact, we must place the matter in proper perspective by a preliminary discussion of the underlying legal issues. This preliminary discussion, which will underscore the issues which we do not confront, will highlight what we do decide.

In our Opinion of October 6, 1972, we addressed the question whether certain actions of Michael Hession, Local 107's chief executive officer, as they were presented to us in the record on the summary judgment motion, were as a matter of law insufficient to absolve the union from liability for the continued breach of the collective bargaining agreement from June 22 through June 25. We concluded that on that record there remained a genuine issue of material fact so that summary judgment could not be granted. The record at that time was simply that at a June 21 membership meeting, Hession admonished the membership that they would be in violation of a state court injunction if the stoppage continued, that he had "ordered" the union members to go back to work, and that they had refused to do so. We thereupon noted:

As a general proposition, a functioning union is held responsible for the mass actions of its members. Vulcan Materials Co. v. United Steel-

workers, 430 F.2d 446, 455 (5th Cir. 1970), cert. denied, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971); United States v. Brotherhood of R. R. Trainmen, 96 F.Supp. 428, 431 (N.D. Ill.1951); United States v. UMW, 77 F.Supp. 563, 566–567 (D.D.C.1948), aff'd, 85 U.S.App.D.C. 149, 177 F.2d 29, cert. denied, 338 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535 (1949). This "rule" is not a statement of the law, but a common-sense proposition of logical factual inference. In United States v. UMW, *supra*, despite a lack of evidence that union leaders had called a strike, the court nevertheless inferred from a mass walkout that the union was responsible: "[M]en don't act collectively without leadership. The idea of suggesting that from 350,000 to 450,000 men would all get the same idea at once, independently of leadership, and walk out of the mines, is of course simply ridiculous." 77 F.Supp. at 566. Furthermore, when, as here, the union leadership instigates the decision to go out on strike, it can be inferred that the leadership also plays a role in the decision when work will resume. Mere failure to take substantial steps to get the membership back to work can constitute sufficient union involvement in the illegal strike to sustain its liability. Vulcan Materials Co. v. United Steelworkers, *supra*, 430 F.2d at 456–457; United States v. UMW, *supra*, 177 F.2d at 36; see United Constr. Workers v. Haislip Baking Co., 223 F.2d 872, 876 (4th Cir.), cert. denied, 350 U.S. 847, 76 S. Ct. 87, 100 L.Ed. 754 (1955); United States v. UMW, 89 F.Supp. 179, 181 (D.D.C.1950), appeal dismissed as moot, 88 U.S.App.D.C. 341, 190 F.2d 865 (1951). The court in *Vulcan Materials Co., supra*, articulated and applied the standard that a union cannot be exonerated from liability for an illegal strike unless its leaders take action which could reasonably be expected to effectuate a return to work. 430 F.2d at 457. And in United States v. Brotherhood of R. R. Train-

men, *supra,* the court found tacit union approval of an illegal strike in the union's failure to discipline striking members. 96 F.Supp. at 432. While the Union has the burden of demonstrating that it exerted very substantial and sincere efforts to get the men back to work if it is to avoid liability in these circumstances, the foregoing precedents refute the plaintiffs' contention that a union is responsible for any strike that it instigates, regardless of any unsuccessful effort it may make to terminate it.

The record before us is far from impressive as to the Union leadership's efforts to get the men back to work at the end of the first day of the strike. However, there is some indication that officials of Local 107 did make such an effort, and we have before us no countervailing evidence that Hession's communications to the Union rank and file were not made in good faith, *see* United States v. UMW, *supra,* 89 F.Supp. at 181, or that other communications were made by Union officers to the membership encouraging them to continue the strike, *cf.* Adickes v. S. H. Kress & Co., *supra* [398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed. 2d 142]. And on a motion for summary judgment, unlike in a decision after trial in a nonjury case, we are not free to draw inferences unfavorable to the Union when other inferences are supportable. At the trial both parties will have the opportunity to present additional evidence, if any there be, bearing on the Union's responsibility for the continuation of the strike after the first day. Since on the present record we are unable to say that the facts are genuinely undisputed so that only legal issues remain, summary judgment is denied on the question of the Union's liability for

continuation of the strike after June 21, 1965.

In the course of our present deliberations, we have again reviewed the cases cited in the foregoing excerpt from our previous Opinion and certain additional cases which the parties have cited in their briefs after trial.[3] Having done so, we are satisfied that, in a situation where union leadership took action directed toward getting the rank and file back to work after commencement of a strike, authorized or not, there is not yet a definitive holding by a federal appellate court, or even a federal district court, that such action can absolve the union from liability for damages (as the union argues), or that it cannot (as the plaintiffs contend). Moreover, in this particular case, that fundamental, but as yet unresolved, issue is clouded by the existence of a contractual provision. Article 43, § 7 of the agreement between the parties provided:

(a) It is further mutually agreed that the Local Union will, within two (2) weeks of the date of the signing of this Agreement, serve upon the Employer and the Employer Association a written notice, which notice will list the Union's authorized representatives who will deal with the Employer, make commitments for the Union generally, and in particular have the sole authority to act for the Union in calling or instituting strikes or any stoppages of work, and the Union shall not be liable for any activities unless so authorized. It is further agreed that in all cases of an unauthorized strike, slowdown, walkout, or any unauthorized cessation of work in violation of this Agreement, the Union shall not be liable for damages resulting from such unauthorized acts of its members.

---

3. Riverton Coal Co. v. UMW, 453 F.2d 1035 (6th Cir. 1972); Firestone Tire & Rubber Co. v. United Rubber Workers, Civil Nos. 1159, 1194 (M.D.Ga.1973); Union Tank Car Co. v. General Truck Drivers Local 5, 309 F.Supp. 1162 (E.D.La.1970); Portland Web Pressmen's Union v. Oregonian Publishing Co., 188 F.Supp. 859 (D.Or.), aff'd, 286 F.2d 4 (9th Cir. 1960), cert. denied, 366 U.S. 912, 81 S.Ct. 1086, 6 L.Ed.2d 237 (1961).

While the Union shall undertake every reasonable means to induce such employees to return to their jobs during any such period of unauthorized stoppage of work mentioned above, it is specifically understood and agreed that the Employer during the first twenty-four (24) hour period of such unauthorized work stoppage shall have the sole and complete right of reasonable discipline short of discharge and such Union members shall not be entitled to or have any recourse to any other provisions of this Agreement. After the first twenty-four (24) hour period of such stoppage and if such stoppage continues, however, the Employer shall have the sole and complete right to immediately discharge any Union member participating in any unauthorized strike, slowdown, walkout, or any other cessation of work and such Union members shall not be entitled to or have any recourse to any other provision of this Agreement.

(b) A properly designated officer of the Eastern Conference of Teamsters shall, within twenty-four (24) hours after request is made, declare and advise the party making such request, by telegram, whether the Conference has authorized any strike or stoppage of work. The Eastern Conference of Teamsters shall take immediate steps to terminate any strike or stoppage of work which is not authorized by it without assuming liability therefor.

It is understood and agreed that failure of the Eastern Conference of Teamsters to authorize a strike by the Local Union members shall not relieve such Local Union of liability for a strike authorized by it and which is in violation of this Agreement.

This provision raises the question whether the parties have contracted away liability of the union for actions of the membership at the point at which they become unauthorized (see note 8 *infra*).

As to the fundamental legal issue which we have described, it would seem to be a keystone of our national labor policy that a union not be permitted to absolve itself from liability when its membership has acted en masse in breach of an agreement; on the other hand, we cannot gainsay that there may be a meritorious case where bona fide and substantial, indeed Herculean, efforts of the union leadership would justify such absolution because of unique or special circumstances giving rise to the continuance of a work stoppage. Fortunately, it is not necessary that we reach, hence we do not decide, those difficult questions in this case, even though the parties' briefs were principally directed to it, for on the record, it is clear that the union is liable even if its position on that fundamental issue of law is correct.

## II. *Findings of Fact*

On the basis of the facts established by our previous Opinion and Order and the evidence adduced at trial, we make the following findings of fact.[4]

On June 20, 1965, Michael Hession (Hession) was the secretary-treasurer and, by sanction of the union's by-laws, chief executive officer of the union. At that point in the history of the union, Hession's position placed him in the veritable eye of the hurricane, for Local 107's affairs were in turmoil. Union politics were rife and there were at least four groups vying for control of the union: the "Real Rank and File" (Hession's group), the "Voice of the Teamsters," the "Dedicated Teamsters," and the "Betterment Committee." Moreover, the Hession leadership was on the "outs" with the International Brother-

4. All of the evidence came from the mouths of union witnesses. The plaintiffs produced none. Although the trial was directed to the one issue of liability remaining after our October 6, 1972, Opinion, the evidence confirmed the correctness of our prior decision. At trial the union witnesses openly referred to the work stoppage in question as a "strike" and conceded that it was against all the plaintiff companies and that it lasted for the full five days. These are precisely the facts concluded by the summary judgment order.

hood of Teamsters led by James R. Hoffa in Washington, D. C. Indeed, the Local's relationship with the International was so bad that Hession feared that the International would impose a trusteeship on the Local at any time.

The employer group with which Local 107 dealt was Motor Transport Labor Relations (MTLR), an association of employers formed to deal with the Teamster locals in the metropolitan Philadelphia area. Settlement of the Roadway strike meant dealing with MTLR, but Local 107's relations with MTLR were also very bad at the time in question here (although the International's relationship with MTLR was excellent). The Roadway strike had left the Teamsters movement in the Philadelphia area in a chaotic state.[5] Thus, the forces bearing on Hession were many: union pressures from within; union pressures from without; and inordinate conflict with the employer bargaining group.

It was against this background that a full membership meeting was called for Sunday evening, June 20th at the Hotel Philadelphia. The union's membership was about 13,000 at the time; approximately 2,000 union members attended, constituting an overflow crowd in the hotel ballroom.[6] All twelve of the union's business agents were there, as well as the entire executive committee and all of the union officers. The Sunday evening meeting was brief. As reflected by the "official minutes," a motion to dispense with the regular business so that the Roadway situation could be discussed was approved. Thereupon Hession recommended that the "membership take a holiday until such time as the Roadway dispute was settled," and the recommendation was approved by acclamation. Hession's recommendation was in harmony with the militant tone of the membership, for various factions within the union had been calling for action in the wake of the Roadway strike. The

following morning the Local 107 members employed by MTLR member companies did not report to work.

On Monday morning, Judge Leo Weinrott of the Philadelphia Court of Common Pleas issued a preliminary injunction against Local 107 and its officers and business agents. Judge Weinrott's order enjoined Local 107 "and all other persons acting on its behalf" from "taking any action or pursuing any course of conduct which is intended to or has the necessary effect of violating, interfering with or disturbing the present contractual relationship between MTLR and Local No. 107." The union's attorney, Marshall Seidman, Esq., was served with notice of the injunction in the late morning and Hession learned about it from him shortly thereafter. At that time Hession was attending an executive committee meeting at the Adelphia Hotel, the purpose of which was to try to find a way to put the Roadway men back to work. This effort was unsuccessful and Hession called an executive committee meeting for 4:00 p. m. that afternoon, at which he received authorization to call a membership meeting for 7:00 p. m. that evening, again at the Hotel Philadelphia.

Prior to the Monday evening membership meeting, Hession went to his home and, as was his custom, took a walk in nearby Fairmount Park. He was met there by members of the dissident factions who lay in wait and picked him up in an automobile. These individuals warned him that if he tried to put the men back to work, they would "blow his head off."

Word of the Monday evening membership meeting was transmitted rapidly through the shop stewards at the various trucking terminals, and an overflow crowd of several thousand union members again jammed the ballroom of the Hotel Philadelphia. All of the business agents, members of the executive com-

---

5. Roadway was a wildcat strike stemming from the discharge of several platform workers at Roadway's Philadelphia terminal.

6. Under the union's bylaws, only 300 members were needed to make a quorum.

mittee, and officers were again there. Hession was the first speaker. After reporting Judge Weinrott's injunction, Hession told the men that he and the union leadership would be subject to jail terms and the union to heavy fines if the men did not go back to work. He told them that they should go back to work on Tuesday morning and that he would try to work out the Roadway grievances thereafter. At that point, the microphone was seized by William Cullen, a leader of the "Voice" faction. In belligerent terms and raucous tones, Cullen urged the membership not to return to work until the Roadway matter was straightened out. When Cullen added, "We're out, let's stay out," an angered mob roared support. Bedlam thereupon broke loose, Hession lost control of the meeting, and 2,000 men stormed out uttering support of Cullen's motion. And the men stayed out. Indeed, on Tuesday the dissident groups seized control of the union offices at 2nd and Spring Garden Streets for a meeting of some 500 to 600 union stewards representing all factions. Over sixty percent of the shop stewards in the Local were present. The purpose of the Tuesday meeting was to set up an organization which would assure that none of the men went back to work; the stewards present were unanimous in their determination to continue the strike.

Although Hession maintained that he exerted strenuous efforts to get the men back to work, we find that on Tuesday morning he did nothing more than talk to a few men standing on the corners around the union headquarters. He did not visit any of the trucking terminals where the bulk of the men were congregated. His efforts lasted a couple of hours at most. Nor did he threaten to fine or suspend or otherwise discipline any of the strikers or stewards going along with the strike, or call any more membership meetings before Saturday (see pp. 779–780, *infra*). Moreover, the other union officers and members of the union executive committee exerted virtually no efforts to attempt to end the strike. Such efforts as Hession made were unavailing and the strike lasted until Saturday morning, when, at a mass meeting at Philadelphia's Convention Hall, the membership voted to go back to work. By that time the men were tired of the strike and anxious to go back to work; moreover, they were aware of the heavy fines which were accumulating daily against the union treasury.

There was much testimony as to the intention of the union leadership and the dissident factions with respect to the calling of the strike. Hession testified that it had been his intention merely to call a work stoppage for only 24 hours. He stated that he interpreted Article 43 § 7 of the contract to absolve the union from liability for the first 24 hours of any strike,[7] and that his purpose in calling the "holiday" was his belief that it would bring someone in from the International to solve the Roadway problem.

Louis Bottone, now president of Local 107, but then a dissident, testified that the dissident groups knew that it took Hession to put the men out but that the dissidents believed that once the strike began they could keep the men out. Ac-

---

7. Article 43, section 7 provides:
   While the Union shall undertake every reasonable means to induce such employees to return to their jobs during any such period of unauthorized stoppage of work mentioned above, it is specifically understood and agreed that the Employer during the first twenty-four (24) hour period of such unauthorized work stoppage shall have the sole and complete right of reasonable discipline short of discharge and such Union members shall not be entitled to or have any recourse to any other provisions of this Agreement. After the first twenty-four (24) hour period of such stoppage and if such stoppage continues, however, the Employer shall have the sole and complete right to immediately discharge any Union member participating in any unauthorized strike, slowdown, walkout, or any other cessation of work and such Union members shall not be entitled to or have any recourse to any other provision of this Agreement.

cording to Bottone, they did not tell Hession that they intended the strike to last longer than 24 hours.

Whatever may be said of Hession's intentions *in pectore*, the fact is that when he called the strike on Sunday evening, he did not call it for 24 hours, but "until the Roadway dispute was settled." We find therefore that he called an open-ended strike and that his recommendation was unanimously followed by the union body. We further find that Hession took no action at all which could be construed as seeking to get the men back to work until late Monday afternoon. We find that Hession's remarks to the union membership at the Monday night meeting were directed principally towards saving the leadership from going to jail and the union treasury from being fined, and that he gave not a forceful direction to return to work under threat of union sanction, but rather a weak exhortation. In any event, we find that the union membership overwhelmingly rejected his exhortation and voted to stay out; hence the continuation of the walkout was mass union action in the purest sense, just as was its initiation.

We find, too, that Hession's efforts on Tuesday to get the membership back to work were virtually nil and that he made no efforts from Tuesday afternoon *through Friday to do so.* Furthermore, we find that no other officer or member of the executive board of the union exerted efforts to get the men back to work after Tuesday morning. Finally, we find that Hession was well aware on Sunday morning of the political maelstrom in which he was engulfed and that he had every reason to believe that once he called for a strike he could not get the men back to work. The actions of the stewards at the Tuesday morning meeting were reflective of the view of the majority of the membership that the strike should continue.

Notwithstanding the foregoing recital, there was even more damning evidence of the intention of Hession and the union leadership with respect to the strike.

For we find as a fact that, shortly before the work stoppage was called, Hession and the union's business agents agreed to pay themselves, in advance, four weeks' vacation pay, a procedure which had never, previously been put into effect at the union. Hession and his cohorts were aware that the failure to settle the Roadway problem would toll their political death knell and perhaps precipitate a trusteeship, and they wanted to protect themselves. This corroborates our finding that Hession and the leadership intended that the strike would continue for so long as was necessary to achieve the union's purposes, *i. e.*, settlement of the antecedent Roadway dispute.

The city-wide work stoppage in question by the membership of Local 107 was, unfortunately, accompanied by violence and breaches of the peace on the part of members of the Local, many of whom were arrested on criminal charges. During the work stoppage, the member companies of MTLR, including plaintiffs, were unable to use equipment located in the Philadelphia area in their operations, were unable to fulfill contracts of carriage, and were otherwise prevented from conducting their business operations. Indeed, the entire City of Philadelphia was partially crippled by the situation set in motion on Sunday evening, June 20, 1965, at the Hotel Philadelphia.·

### III. *Discussion*

■ The events which we have recounted constitute one of the shabbiest chapters in the history of the labor movement in Pennsylvania. While our recitation has been lengthy, it at least renders the discussion portion of this *Opinion* brief. For, under the applicable law, it is clear that the matter left open by our previous Opinion and Order must be resolved in favor of the plaintiffs, as we conclude that Local 107 remained in breach of its collective bargaining agreement with the plaintiffs throughout the period of the strike.

■ The core of our federal labor policy is the promotion of industrial peace and stability by encouraging the practice and procedures of collective bargaining. "If unions can breach agreements with relative impunity, then such agreements do not tend to stabilize industrial relations. . . ." S.Rep.No. 105, 80th Cong., 1st Sess. at 16 (1947), quoted in Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 454, 77 S.Ct. 912, 916, 1 L.Ed.2d 972 (1957). The well-established principle of union liability for damages resulting from breach of a no-strike clause is, then, fully consonant with the federal labor policy. The case at bar, though unusual in some respects, is a case where precedent calls for a finding of liability. As will be seen, liability flows from several lines of reasoning.

First, the strike was authorized by the official leadership of the union and overwhelmingly approved by the rank and file, not just for one day, but for its duration, *i. e.*, as long as the Roadway dispute lasted. Accordingly, the continuation of the strike after the first day was not an unauthorized, or wildcat, strike. The conclusion that the continuation of the strike after the first day was not unintended or entirely disapproved of is also supported by: (1) the payment by Hession and the business agents to themselves of four weeks' vacation pay; and (2) the failure of the leadership to make whole-hearted efforts to end the strike during the week (see pp. 775–776 *supra*).

In further support of their position, the plaintiffs have urged the proposition that a union is responsible for the mass action of its members, whether authorized or not, because a union is no more than a collective association of its members. We are inclined to agree that, in general, this is a correct principle of labor law. This was the holding in United States v. Brotherhood of R. R. Trainmen, 96 F.Supp. 428 (N.D.Ill.1951). That case was a contempt proceeding for violation of an injunction against a strike. The court found as a fact that the union leadership had made numerous efforts to get the men back to work, and absolved the officers of liability for contempt. But the union itself was nonetheless liable. In its bench opinion the court said:

[A]s long as a Union is functioning as a Union it must be held responsible for the mass actions of its members. That means this, that when the members go out and act in a concerted fashion and do an illegal act the Union is responsible. They just can't say, "Oh well, we didn't do that as Union members."

If they are members of the Union, then they do act in concerted fashion under the decisions of the courts of this country; if it is a mass action the Union is responsible for that sort of an action.

96 F.Supp. at 431. Similarly, in Portland Web Pressmen's Local 17 v. Oregonian Publishing Co., 188 F.Supp. 859 (D.Or.), aff'd, 286 F.2d 4 (9th Cir. 1960), cert. denied, 366 U.S. 912, 81 S. Ct. 1086, 6 L.Ed.2d 237 (1961), the court, in testing the parties' pleadings, attached no significance whatsoever to the union's defensive allegation that the union leadership "unequivocally advised its members of its and their obligation not to strike and not to engage in work stoppages." That fact was deemed irrelevant to the question of the Union's liability.

■ In terms of the national labor policy, it is particularly appropriate that a union be responsible for the collective action of its members in engaging in a strike regardless of the conduct of its officers, because the employer has no damage remedy against the individual strikers, Sinclair Oil Corp. v. Oil Workers Union, 452 F.2d 49 (7th Cir. 1971). The argument for liability is even stronger where, as here, the union members are acting, in one sense, under the leadership of their official representatives, and, in another, under the leadership of dissident groups. For then their actions are hardly to be viewed as individual, unorganized acts.

However, the mass action principle as such is a principle applicable to the determination of union liability for unauthorized strikes, and not for authorized strikes, since its application to authorized strikes would be meaningless, adding nothing to the already present liability. Hence we need not rely on the principle in our decision of this case.[8]

Second, we have found that regardless of the union leadership's original intentions with respect to the duration of the strike, it knew or should have foreseen that the political strife within the union would make it impossible to terminate the strike with the same ease with which it was called. Given this situation, even assuming arguendo that the strike became unauthorized after the first day, we will not absolve the union of liability for the foreseeable consequence of the illegally called strike. We find support for this position in Union Tank Car Co. v. General Truck Drivers Local 5, 309 F.Supp. 1162 (E.D.La.1970). There a strike violative of a contractual no-strike provision continued past the expiration date of the contract. The court held the union liable for damages suffered by the company during the period after the contract expired (as well as the earlier period) on the ground that the continua-tion of the strike after the expiration of the contract period was a foreseeable consequence flowing from the original decision to go on strike, and would not have occurred had the strike not been called.[9]

Third, even if we were to assume arguendo that the strike became unauthorized after the first day, and even if it had not been foreseeable that the leadership would be unable to get the men back to work after the first day of the strike, the union leadership did not make sincere efforts to terminate the strike it had started. As detailed in our findings, the totality of the leadership's efforts to terminate the strike was minimal. At the Monday meeting, Hession informed the membership of the injunction against the strike; he did not order them to return to work. His efforts later in the week were halfhearted. On Tuesday he spent a few hours talking to the strikers gathered near the union office, but he never visited the trucking terminals and made no further efforts after Tuesday. Never were there any threats of disciplinary measures against union members for continuing the strike. We conclude that the measures taken by Hession and the leadership, especially when measured against the steps available to them, could not reasonably have been expected

8. To the extent that it may be argued that the strike became unauthorized after the first day, there is also a reason for not basing liability on the mass action principle as it affects *unauthorized* action: the principle was abrogated by the very contract on which this lawsuit is based. The collective bargaining agreement expressly provided that "the Union shall not be liable for any activities unless [authorized by 'the Union's authorized representatives who will deal with the Employer, make commitments for the Union generally, and in particular have the sole authority to act for the Union in calling or instituting strikes or any stoppages of work']." We agree with Judge Teitelbaum who, in Eazor Express, Inc. v. International Bhd. of Teamsters, 357 F.Supp. 158 (W.D. Pa.1973) (discussed at length at pp. 779–780 *infra*), construing the same provision in the newer version of the Teamsters' National Master Freight Agreement, concluded that "to apply the 'mass action' principle, which I perceive as making the union as an entity liable for the actions of any mass of its members with respect to any particular employer, in the face of the instant agreement would be to not only negate but rewrite its express provision to the contrary." 357 F. Supp. at 163 n. 7.

9. The plaintiffs have urged us to apply ordinary contract principles to the foreseeability issue in this case, since it is, despite its labor law setting, an assumpsit action. They cite, of course, Hadley v. Baxendale, 9 Exc. 339 (1854), the foundation case of the rule that the scope of liability for breach of contract extends to reasonably foreseeable damages flowing from the breach. We do not apply such a rule here because in its extreme breadth it could in many situations contradict narrower and more specifically applicable labor law principles.

to effectuate the termination of the strike, see Vulcan Materials Co. v. United Steelworkers, 430 F.2d 446, 457 (5th Cir. 1970), cert. denied, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247.[10] This conclusion is buttressed by an examination of Eazor Express, Inc. v. International Bhd. of Teamsters, 357 F.Supp. 158 (W.D.Pa.1973), a thorough and well-reasoned opinion by Judge Hubert Teitelbaum which dealt with a Teamsters strike in violation of the same contract (though a newer version) involved here.

In *Eazor*, a dispute arose over work assignments when two employees were fired for refusing to do certain work. A number of union members threatened to picket and to precipitate a strike, whereupon a union business agent and vice-president cautioned the picketers in advance about their proposed activity. However, while the union was pursuing the matter through the grievance procedure, several union members began picketing the Eazor terminal thus precipitating the work stoppage. Judge Teitelbaum found that the strike was unauthorized but, finding a duty on the part of the union to take "every reasonable means" to terminate even wildcat strikes, went on to examine the nature and extent of that duty and whether the union had fulfilled the obligations imposed by the duty. Finding the obligation to be quite demanding, Judge Teitelbaum held the union liable for the strike, even though it never authorized it, because it failed to discipline or threaten to discipline the strikers, fine them, discipline the union stewards, suspend the strikers' union membership, continue to order them to return to work, or hold repeated secret ballots to give the members a chance to vote to end the strike without fear of pressure or retaliation. In *Eazor,* as here, "all of

the efforts of the officials of [the union] to end the strike took the form of urgings or cajolings to the men to go back to work." Judge Teitelbaum wrote:

I do not think that the efforts of the union amounted to a discharge of its duty to undertake every reasonable means to effect the cessation of the strike. I think the evidenced policy of simply urging the men to return to work was far too timid. Many other and potentially more effective approaches were available to the union. O'Neill admitted the union's right to "lift a . . . member's 'book' ", yet it did not do so. . . . Nor at any time during the strike were the strikers even threatened with discipline or fines, much less actually disciplined or fined. Further, at at least two meetings at the union hall of the strikers, O'Neill permitted only visual voting rather than voting by secret ballot. In general and in short, the toughness with which the union officials approached their striking members was less than intimidating.

Whether or not any of the untaken tacks or unsummoned measures would have produced the cessation of the strike is unknowable. It is important only that they were reasonable, available, significant and potentially productive. . . .

I do not doubt that the mood of the strikers was ugly—that is perfectly evident from the violence which occurred during the strike. But that mood made bold, firm steps to return the men to work all the more imperative. I think that the circumstances called for the politics of power rather than the politics of persuasion. The contractual duty of the union went beyond merely beckoning the strikers

---

10. Compare the facts of Penn Packing Co. v. Amalgamated Meat Cutters Local 195, Civil No. 71–2416 (E.D.Pa. Aug. 30, 1973), where our colleague, Judge VanArtsdalen, absolved the union of liability for an unauthorized (wildcat) strike because, he concluded, "the union took every conceivable step to promptly terminate the walkout." There union officers ordered the men back to work at three separate meetings within a 27-hour period, then offered to satisfy the strikers' grievance by paying the salaries of the men discharged by the company until the underlying dispute was settled.

780

back to work. It made it mandatory for the union to undertake every reasonable means, of course, available and indicated to cause the strikers to return to work. I think too many resources were available and indicated, including removing the stewards and committeemen who were leading and organizing the strike . . . imposing daily fines on all strikers; and taking "votes" by secret ballot, and were untapped.

357 F.Supp. at 166–167. The similarity of *Eazor Express* to this case is striking. The violent mood of the strikers was no excuse; tough methods of forcing the men back to work were called for, and the leadership made only mild exhortations. This is the issue which we found was still open when we denied the plaintiffs' motion for summary judgment, because the union had alleged that it made every reasonable effort to terminate the strike; we now conclude that the proof at trial did not support the union's claim.

In addition, the failure of the union leadership to do everything reasonably possible to get the men back to work was in itself a breach of the collective bargaining agreement, for in Article 43, Section 7, quoted more fully above at pp. 773–772, it was agreed that "the Union shall undertake every reasonable means to induce such employees to return to their jobs during any such period of unauthorized stoppage of work . . . ." Thus the leadership's failure on this score itself gives rise to liability for the continuation of the strike.

## IV. *Conclusion*

It is clear from the foregoing findings and discussion that the union must be held liable for breach of the collective bargaining agreement for the full five days of the strike. We have found intent on the part of the leadership to call an open-ended strike, mass action of the union membership to institute it, mass action of the membership to continue it, and no concerted effort by the leader-

ship to stop it, despite the availability of the several tools enumerated in *Eazor Express*. And even if we were to have found bona fide efforts by the leadership to stop the strike, we would not reach a different result because it was clearly foreseeable, given the internal and external strife in the union, that once the strike was called it could not be stopped. It would be a travesty on our national labor policy were we to hold that the union could avoid liability on these facts.