EAZOR EXPRESS, INC., a corporation, Plaintiff,

v.

The INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local Union No. 249, Defendants.

DANIELS MOTOR FREIGHT, INC. and Eazor Express, Inc., Plaintiffs,

v.

LOCAL 377, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Defendants.

Civ. A. Nos. 68–1014, 69–1235.

United States District Court, W. D. Pennsylvania.

March 30, 1973.

Tom P. Monteverde, Pelino, Wasserstrom, Chucas & Monteverde, Philadelphia, Pa., Ralph T. DeStefano, Thorp, Reed & Armstrong, Pittsburgh, Pa., for plaintiffs.

Ben Paul Jubelirer, Pittsburgh, Pa., Eugene Green, Green,· Schiavoni, Murphy & Stevens, Youngstown, Ohio, Joseph M. Maurizi, Balzarini, Walsh, Conway & Maurizi, Pittsburgh, Pa., Sidney Dickstein, Morin, Dickstein, Shapiro & Galligan, Washington, D. C., for defendants.

## OPINION

### TEITELBAUM, District Judge.

These are actions in which the plaintiff employers, Eazor Express, Inc. ("Eazor") and Daniels Motor Freight, Inc. ("Daniels"),[1] seek to recover damages for unlawful strikes from the defendant labor organizations, the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("International") and two of its locals, Local 377 and Local 249. The jurisdictional basis of both actions,

1. At the time of the events complained of, Eazor, which had contracted to purchase all of the outstanding stock of Daniels, was operating Daniels by virtue of an authority of temporary control issued to it by the Interstate Commerce Commission. The transaction was eventually consummated on April 30, 1970. Moreover, Daniels' labor agreement provided that in the event another company assumed temporary authority of Daniels' operations, that company would assume the obligations of the agreement. Since the rights of an agreement generally follow the obligations and, of course, since Eazor was operating Daniels under an authority of temporary control, for purposes of these actions at least, Daniels was essentially, and will be treated as, an operating subsidiary of Eazor.

which were consolidated for trial,[2] is stipulated by all parties to be § 301 of the Labor-Management Relations Act of 1947 (29 U.S.C. § 185, as amended). Section 301 provides, in pertinent part, that,

> "[S]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court . . . ."

The contracts alleged by the plaintiffs to have been violated are the National Master Freight Agreement, covering the period April 1, 1967 through March 31, 1970, to which the plaintiffs, the defendant locals, and the National Over-The-Road and City Cartage Policy and Negotiating Committee of the International ("National Committee") were parties, and the various supplements thereto, *viz.* (1)(a) the Joint Council No. 40, Freight Division, Over-The-Road Supplemental Agreement and (b) the Joint Council 40, Freight Division, Local Cartage Supplemental Agreement, both being between Eazor, the National Committee and Local 249, and (2)(a) the Central States Area Over-The-Road Supplemental Agreement, with Ohio Rider, and (b) the Central States Area Local Cartage Supplemental Agreement, both being between Daniels, the National Committee and Local 377, and (3) the National Iron and Steel and Special Commodities Supplemental Agreement.

The alleged violations of these contracts are strikes—one by Local 377 against Daniels (at all relevant times Local 377 was the exclusive bargaining agent for drivers, dock employees, and garage employees working out of or at Daniels' terminal at Warren, Ohio) and one by Local 249 against Eazor (at all relevant times Local 249 was the exclusive collective bargaining agent for drivers, helpers, and warehousemen working out of or at Eazor's terminal at Pittsburgh, Pennsylvania). The strikes began on August 20, 1968, when the members of Local 377 walked off their jobs at Daniels' Warren terminal. By the following morning, August 21, a picket line had been established at Eazor's Pittsburgh terminal which was not only honored but supported by members of Local 249. The ensuing strikes of both terminals, which were characterized by roving bands of pickets and notable violence, ended for Daniels on September 17, 1968, when the terminal was permanently closed[3] and for Eazor on September 25, 1968, when the members of Local 249 returned to work.

Neither strike was authorized or sanctioned, either by the respective local officials or by International officials, i. e., each was a "wildcat" strike.[4] Both, however, were admittedly violations of the "no strike" provision of the supplements to the National Master Freight Agreement which recites as follows:

> "The Union[s] and the Employers agree that there shall be no strike, lockout, tie-up, or legal proceedings without first using all possible means of [a] settlement, as provided for in this Agreement [and in the National Agreement, if applicable] of any controversy which might arise."[5]

Accordingly, the contentions of the parties surround the issues of liability for any damages caused by the strikes. The International contends (1) that it is not a party to any of the agreements and

---

2. The trial, which was non-jury, was bifurcated. Consequently only the first stage, at which only evidence relevant to the issues of liability was adduced, has been completed. At this juncture, then, I will treat with and dispose of only the issues of liability.

3. The terminal has never been reopened.

4. The term "wildcat" strike is interpreted differently by the parties to this action. I use it to mean a strike which is not authorized by union officials, rather than not authorized by the labor agreements.

5. It is not disputed that neither of the two grievances which immediately precipitated the strike had been processed through all of the steps of the grievance machinery at the time of the strikes.

(2) even if it is, it did all that the agreements obliged it to do. Locals 377 and 249 deny liability (1) because the agreements provide that only specially designated stewards and alternates have authority to call strikes and that none of those so designated called the strikes, and (2) that the agreements provide that they shall not be held liable for the unauthorized acts of stewards and alternates generally.

## THE DANIELS' STRIKE WAS NOT AUTHORIZED.

Locals 377 and 249 rely on Article 4 of the National Master Freight Agreement which provides as follows:

"Job Stewards and alternates have no authority to take strike action . . . except as authorized by official action of the Local Union. The Employer recognizes these limitations upon the authority of job stewards and their alternates, and shall not hold the Union liable for any unauthorized acts."

Article 4 further, as the *quid pro quo* for the employers relinquishing of any rights it may have against the union for unauthorized work stoppages, vests in the employer the unquestionable authority to "impose proper discipline, including discharge, in the event the shop steward has taken unauthorized strike action". The Central States Area supplements complement this provision.[6] Article 43, Section 2 of the Central States Area supplements requires the local union to furnish, within two weeks of the signing of the agreements, the employer with a list of its members who have the authority to act for the union in calling strikes, and provides (1) that the union "shall not be liable for any activities unless so authorized" and (2) that in the event of an unauthorized strike the union "shall not be liable for damages". Article 43, Section 2 fur-

ther, however, makes it mandatory for the union to,

" . . . undertake every reasonable means to induce [striking] employees to return to their jobs during any [unauthorized strike]."

The representative designated pursuant to Article 43, Section 2 of the Central States Area supplements was John J. O'Neill, at all relevant times a business agent for and a vice-president of Local 377. The plaintiffs urge that O'Neill actually called the strike, and, resultingly, that the liability of Local 377 and the International is patent. The initial factual issue to be resolved, then, is whether or not the evidence supports the conclusion that O'Neill in fact called the strike in Warren.

Many of the events surrounding the inception of the strike in Warren are undisputed. On Saturday, August 17, 1968, the employment of Kenneth Roper, a garage employee of Daniels and a member of Local 377, was terminated because he refused a work assignment. On Monday, August 19, the employment of Jack Eckley, a driver employee of Daniels and a member of Local 377, was terminated similarly because he refused a work assignment. To attempt to resolve the outgrowing grievances of Roper and Eckley, meetings were held at Daniels' Warren terminal on the morning of August 20, between representatives of Daniels and of Local 377. In attendance at the meetings, among others, were O'Neill, the grievants, and Clyde Clark, a manager of Daniels.

The meetings not only proved fruitless, but served to inflame the antagonists. At the trial there was uncontroverted testimony of heated verbal exchanges and physical shovings. The testimony regarding the note on which the meetings concluded and the events which followed the meetings, however, was not uncontested. Clark testified that as the meeting ended O'Neill said, "I'm giving

---

6. Probably inadvertently, the Joint Council No. 40 supplements do not. There is no contention, however, that the strike by Local 249 was called by anyone authorized to do so.

you a seventy-two hour strike notice for your Ohio Southern Drivers." He testified that immediately after the meeting he saw O'Neill walking about the terminal and that within ten minutes of the last time he saw O'Neill, a driver named Gene Latta advised him that "the terminal was going to go out on strike".

O'Neill readily admitted walking about the terminal and, in fact, talking with the employees. He testified that it was his practice to mingle with the employees, at least those who were members of Local 377, when he visited a terminal; that he made it "a point [that day] because it was right prior to election"; and that he talked with the employees generally about "beefs" or grievances they had and about the meetings which had taken place that morning. But O'Neill denied that he threatened to call a strike. Rather, he testified that at the meeting he made "absolutely" no reference to Clark of a strike. Further, he testified that from the terminal he proceeded to "Huffman's", a truck stop which was located across the street from the terminal and talked with the members of Local 377 who were gathered there. He testified that, in fact, he talked there with Eckley about the meetings and that when Eckley suggested that he was going to start picketing, he counseled him "that he had better not". Notwithstanding his advice, however, later that afternoon Roper and Eckley, each with a little camp stool and a placard reading "Unfair Labor Practice", began to picket Daniels' Warren terminal and thus the strikes were precipitated.

Although the circumstances and the sequence of events are undeniably suspicious, I find, in the absence of evidence to contradict the testimony of O'Neill as to the essence of the text of his conversations with the employees both at the terminal and at Huffman's, and in the light of the substantially corroborative testimony of Bob Eliser and John Arnold, two officials of Local 377 who were with O'Neill at times during the day of the inception of the strike, that he did not call the strike, and that, in fact, he cautioned against it. Therefore, since there is no evidence of designations of any other officials or members of Local 377 as having been conferred the authority to call strikes, I conclude that the strike was not authorized by Local 377. Cf. Blue Diamond Coal Co. v. United Mine Workers of America, 436 F.2d 551 (6th Cir. 1970).

## EACH DEFENDANT'S OBLIGATION WAS TO USE "EVERY REASONABLE MEANS" TO END THE STRIKE.

Alternatively, the plaintiffs seek to impose liability on Local 377, as well as on Local 249 and the International, on the theory that the agreements were breached in that every reasonable means to end the strike was not undertaken.[7] With respect to Local 377, the duty is express. Article 43, Section

---

7. The plaintiffs have also pressed as a theory of at least Locals 377 and 249's liability, their vicarious responsibility for the "mass action" of their membership. This theory, first announced as a "principle of law" in United States v. United Mine Workers of America, 77 F.Supp. 563 (D.C.D.C.1948) and most recently invoked in Vulcan Materials Co. v. United Steelworkers of America, 430 F.2d 446 (5th Cir. 1970), *cert. denied*, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971), and Colt's Inc. v. Amalgamated Local 376, 314 F.Supp. 578 (D.C.D.Conn. 1970), holds that,

" . . . as long as a union is functioning as a union it must be held responsible for the mass action of its members." United States v. United Mine Workers of America, *supra*.

I think the principle well conceived but inappropriate to this action simply because by the terms of the National Master Freight Agreement the plaintiffs have agreed to "not hold the Union liable for any unauthorized acts". See Adley Express v. Highway Truck Drivers and Helpers, Local 107, 47 F.R.D. 356 (D.C. E.D.Pa.1969). To apply the "mass action" principle, which I perceive as making the union as an entity liable for the actions of any mass of its members with respect to any particular employer, in the face of the instant agreement would be to not only negate but rewrite its express provision to the contrary.

2 of the Central States Area supplements obligates the union to "undertake every reasonable means to induce employees [engaged in an unauthorized work stoppage] to return to their jobs". No similar provision, however, is contained in the Joint Council No. 40 supplement or the National Master Freight Agreement. If either, or both, Local 249 or the International is obligated to do likewise, then, the obligation must be implied. Moreover, since both Local 249 and the International are expressly not liable for unauthorized strikes, any such obligation must be implied without reliance on and quite apart from any principles of vicarious liability.[8]

Whether or not the obligation expressed in the Central States Area supplements is implicit in the Joint Council No. 40 supplements and the National Master Freight Agreement involves an interpretation of the agreements. The principles which control the interpretations of collective bargaining agreements were recently reviewed in Kellogg Company v. NLRB, 457 F.2d 519 (6th Cir. 1972). There, quoting from Refinery Employees' Union v. Continental Oil Company, 160 F.Supp. 723, 731 (D.C. W.D.La.1958), it was stated *inter alia* that:

"[C]ourts cannot make contracts for the parties, and can declare implied obligations to exist only when there is a satisfactory basis in the express provisions of the agreements which make it necessary to imply certain duties and obligations in order to effect the purposes of the parties. Before an obligation will be implied it must appear from the contract itself that it was so clearly in the contemplation of the parties that they deemed it unnecessary to express it, and therefore omitted to do so, or that it is necessary to give effect to and effectuate the purpose of the contract as a whole."

■ If a duty to undertake every reasonable means to put an end to an unauthorized strike is to be implied, the main wellspring from which it must arise is the express duty of the unions, as entities, to refrain from striking the employers of its members. One of the premises central to the concept of collective bargaining, itself the cornerstone of labor-management relations, is that labor unions represent and bargain on behalf of their members. Labor unions ostensibly exist for the sole purpose of equalizing the obvious and socially intolerable imbalance of power between employer and employee which would prevail in their absence.

Concededly, the duty not to strike imposed by the agreements involved in this action inhibits only strikes called, authorized or comforted by the unions' officials. The duty is probably the most important one undertaken by the unions. As was observed in Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S. Ct. 912, 1 L.Ed.2d 972 (1957), quoting from S.Rep. No. 105, 80th Cong., 1st Sess., p. 16,

"[T]he chief advantage which an employer can reasonably expect from a collective [bargaining] agreement is assurance of uninterrupted operation during the term of the agreement."

■■ The importance of the recognition by a union of that expectation with respect to "no-strike" provisions is both demonstrable and critical to industrial peace. Thus, labor agreements must always be construed with that expectation or end in mind. It would seem, then, that purely as a matter of interpreting the agreements with a view to effectuating the purpose of the contract as a whole, the employer having dealt with its employees collectively through their representative, it is reasonable to imply an obligation by their representative to take whatever reasonable measures are available and indicated to prevent or bring to an end an activity engaged in by its members in which it as an entity is not free to engage.[9] The reasonableness of impos-

---

8. See n. 7.

9. That the implied obligation requires affirmative action to carry out, while the

ing this burden on the union is particularly apparent where, as here, the benefits of the concession exacted from the employer in return for the no-strike obligation, *viz.*, the agreement to submit grievances to final and binding arbitration,[10] inure directly to its members, indeed, as well as to those of its members who instigated the strike.

Additionally, as a matter of public policy it is desirable to impose an obligation upon a union to take steps to frustrate its members from doing that which it is contractually prohibited from doing as an entity. The emphasis which federal labor law and the policy underlying that law, places on the peaceful resolution through arbitration of industrial disputes, and the avoidance, wherever and whenever possible, of labor strikes,[11] particularly those involving violence, suggests that such an obligation be implied most needfully, and consequently most readily, in instances of "wildcat" strikes.[12] Therefore, in conclusion, I think that a fair reading of the Joint Council No. 40 supplements, as well as the National Master Freight Agreement, in the context both of the meaningful effectuation of the purposes of the express provisions of the agreements, and of federal labor policy, requires the implication of an obligation upon both Local 249 and the International to undertake every reasonable means to induce "wildcat" strikers to return to work.[13]

## NEITHER LOCAL EMPLOYED "EVERY REASONABLE MEANS" TO END THE STRIKE.

It is not disputed that the strikes, both of Daniels' Warren terminal and of Eazor's Pittsburgh terminal, were publicly denounced as illegal by each of the unions' officials. Nor is it disputed that O'Neill of Local 377 and Thomas Fagan, president of Local 249, told the strikers of their respective locals to return to work. O'Neill testified that he first learned of the strike on the evening of August 20, when he received a telephone call at home. He testified that that night he instructed Gene Martin, a union steward, to "tell those guys to get to work"; that the next morning he went to Daniels' terminal and told the men who were picketing there that "they better get back to work"; and that from there he proceeded to Huffman's where he told the men gathered there they "had better get back to work". He testified that he then returned to his office where he received a telephone call from Bill Presser of Joint Council No. 41; that Presser agreed to dispatch two men to assist him in his efforts to get the strikers back to work, which he did; and that the three of them went to Huffman's where they unsuccessfully tried to get the men to return to work. Further, he testified that about a week after the strike began he was advised by Presser that arrangements had been made to expedite the

express obligation is merely to refrain from action is of no moment. The agreement imposes many duties upon the unions which require affirmative action. It is a "living" agreement; it is one which, unlike a contract calling for a single performance, is carried out by both sides daily during its effective term.

10. See The Boys Markets, Inc. v. Retail Clerks Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

11. See The Boys Markets, Inc. v. Retail Clerks Union, *supra*, n. 10; United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.

2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); and Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

12. Moreover, realistically, in the absence of such an implied obligation, without intending to impugn the integrities of any of the unions involved in this action, the way is clear for a union to furtively call for or encourage an activity while publicly disavowing it.

13. See, *contra*, United Construction Workers v. Haislip Baking Co., 223 F.2d 872 (4th Cir. 1955), *cert. denied*, 350 U.S. 847, 76 S.Ct. 87, 100 L.Ed. 754 (1955).

grievances of Roper and Eckley; that he reported the availability of the arrangements to the men on the picket line; and that the "offer" was unhesitatingly and resolutely rejected.

He testified further that there was a meeting on September 3, 1968, the principals at which were himself, Presser and a number of the strikers, including Martin, who was apparently one of the leaders of the strikers. At the meeting the men were told they had to go back to work before the grievances were processed. The men responded by inviting Presser to "go to hell". O'Neill had no recollection of other efforts during the remainder of the week of September 3 to end the strike, i.e., efforts *vis-a-vis* the members of Local 377.

The next meeting with the men took place on September 9. It was called by the union and was held at the union hall. It was attended by "just about every man from the company with the exception of those who were sick or on vacation", or by approximately 250 to 300 men. O'Neill testified that he presided over the meeting and that he urged all those in attendance to go back to work. He testified that the principal speaker at the meeting was an attorney, Bernard Berkman. He testified that Berkman also urged them to go back to work, but that they voted "almost to a T" to continue the strike. Thereafter, Daniels on September 17 discharged all of its striking employees and on September 18 permanently closed its Warren terminal. In sum, all of the efforts of the officials of Local 377 to end the strike took the form of urgings or cajolings to the men to go back to work.

█ I do not think that the efforts of the union amounted to a discharge of its duty to undertake every reasonable means to effect the cessation of the strike. I think the evidenced policy of simply urging the men to return to work

was far too timid. Many other and potentially more effective approaches were available to the union. O'Neill admitted the union's right to "lift a . . . member's 'book' ", yet it did not do so. Indeed, the evidence is that a number of the strikers worked for other companies during the strike. Most likely this would not have been possible had the union lifted the "books" of the strikers. Nor at any time during the strike were the strikers even threatened with discipline or fines, much less actually disciplined or fined. Further, at at least two meetings at the union hall of the strikers, O'Neill permitted only visual voting rather than voting by secret ballot.[14] In general and in short, the toughness with which the union officials approached their striking members was less than intimidating.

Whether or not any of the untaken tacks or unsummoned measures would have produced the cessation of the strike is unknowable. It is important only that they were reasonable, available, significant and potentially productive. I conclude, then, that Local 377 breached its labor agreement with Daniels in that it failed to undertake every reasonable means to induce the "wildcat" strikers to return to their jobs.

Local 249 not only had a like obligation, it discharged it with a like lack of imagination. Fagan testified that he first learned of the strike of the Eazor terminal in Pittsburgh on the morning of August 21. He testified that he proceeded immediately to the terminal where he "notified" the strikers of the illegality of the strike.[15] He testified further that his initial strategy, after failing in his personal attempts to persuade the strikers to return to work by request, was (1) to hold a meeting among Eazor's principals (Thomas and Robert Eazor), representatives from the International and Joint Council No. 40 (Nor-

---

14. Interestingly, the strike by Local 249 was ended on the first secret ballot vote by the strikers.

15. In addition to honoring the pickets from Local 377, the men from Local 249 struck over their own long pending unresolved grievances regarding the maintenance of working standards.

man Kegel and Daniel DeGregory), and the leaders of the strikers (William Gilmer and Robert McLallen),[16] at which he ordered the dissidents to return to work, and (2) to hold a meeting of the striking members of Local 249 at which he employed "all the persuasive ways that [he] could think of" to try to talk the men into going back to work. He testified that at the meeting of the strikers, which took place three days after the strike began, a "vote" was taken by a show of hands which was carried by those opposed to ending the strike. Neither meeting was fruitful.

Fagan testified further that on September 4, on his instructions, a letter was written to the International for the purpose of enlisting their assistance in getting the men to go back to work. In response the International sent three men to speak at another meeting of the strikers which Fagan arranged for September 14. At that meeting, attended by approximately 150 men, all three men sent by the International, as well as Fagan, implored the strikers to resume working. They told them that until they resumed working "there was no way that there could be any help forthcoming from the International". The men angrily rebuffed their pleas. Following that meeting, although there were a few meetings of small groups, there were evidently no other mass meetings with the strikers until that of September 24 at which they voted, by secret ballot, to return to work. Fagan led the men back to work the next day.

Fagan testified, concludingly, with no specifics aside from his allusions to his commands to the men to return to work, that "at all times [he used his] best efforts in attempting to get [the] men back to work". He testified, too, that at the meeting attended by approximately 150 men he made veiled threats in the form of advising the men of the power of the union to fine, suspend or expel them for their illegal actions. He testi-

fied, however, that he never threatened either the stewards or the committeemen with removal.

■ I do not doubt that the mood of the strikers was ugly—that is perfectly evident from the violence which occurred during the strike. But that mood made bold, firm steps to return the men to work all the more imperative. I think that the circumstances called for the politics of power rather than the politics of persuasion. The contractual duty of the union went beyond merely beckoning the strikers back to work. It made it mandatory for the union to undertake every reasonable means, of course, available and indicated to cause the strikers to return to work. I think too many resources were available and indicated, including removing the stewards and committeemen who were leading and organizing the strike; insuring that no strikers were elsewhere employed (as in fact they were) during the strike by lifting their "books", or at least by forbidding their use of the union's hiring hall facilities in seeking other employement; imposing daily fines on all strikers; and taking "votes" by secret ballot, and were untapped. Consequently I conclude that Local 249 breached its labor agreement with Eazor.

## THE INTERNATIONAL IS A PARTY TO THE NATIONAL MASTER FREIGHT AGREEMENT.

The plaintiffs lastly contend that in addition to Locals 377 and 249, the International violated the contracts. The International denies not only that it failed to live up to what would have been its obligations had it been a party to the contracts, but also that it is a party to them.

In a technical sense, the International's latter position is unassailable. It was not a signatory to the agreement; rather its "National Committee" was. The inquiry, then, must be into the relationship between the National Commit-

---

16. The latter two were steward and committeeman, respectively, for the over-the-road drivers at Eazor's Pittsburgh terminal.

tee, the signatory to the agreements, and the International.

The authority for the National Committee originated with a resolution of the Executive Board of the International. The authority was granted for the purpose of accomplishing national bargaining and national agreements, which were deemed by the Executive Board to be in the best interests of all the members of the International. The actual creation of the National Committee was by way of a resolution of a "Conference of Representatives" from the International's local unions and joint councils. Finally, the National Committee was activated, at least in form, by virtue of a power of attorney from the International's unions.

█ Notwithstanding the formalities surrounding its creation, the National Committee is intimately associated with the International. At all relevant times its members were appointed by the president of the International pursuant to authorization from the Executive Board; many of its members were contemporaneous members of the International's Executive Board; it was chaired by the president of the International; its funding was controlled by the International; and the International conducts the ratification vote its constitution requires after a national accord with its members' employers is reached. The National Committee has no status or shape as a labor organization independent of the International. It has no constitution or by-laws, and files no reports with the Department of Labor as it would be required to do if it were a labor organization. In short, it is organizationally and functionally an administrative arm of the International. Its sole purpose, to achieve national negotiations and national agreements, furthers the aims of the International. While it may act, in terms of the sophistries, on behalf of the local unions, in terms of the realities, it acts on behalf of the International. I conclude, therefore, that the International, through its National Committee, is a party to the labor agreements.[17]

## THE INTERNATIONAL DID NOT EMPLOY "EVERY REASONABLE MEANS" TO END THE STRIKE.

█ As a party, the International's obligation, like Local 249's, is implicit. It derives from its commitment in the National Master Freight Agreement not to strike. There is no question that the International neither authorized nor sanctioned the strikes. Nor is there a question that it offered aid or comfort to the strikers. Rather, the issue is simply whether or not it reasonably and fully discharged its implied duty to exercise its powers to endeavor to get the men to go back to work.[18]

On August 21, 1968, immediately upon learning of the strikes, Frank Fitzsimmons, vice-president of the International, sent telegrams to Thomas Fagan and John Angelo (an officer of Local 377) which declared the strikes to be illegal and instructed them to return their men to work. Further, on August 21, Norman Kegel, an International organizer, went to the picket line at Eazor's Pitts-

17. The International's contention that the "disclaimer" which appears at the end of each agreement which states that the International "approved [the agreement] as to form only" and,

   " . . . in doing so [assumed] no liability whatsoever under [the agreement] for the performance thereof or otherwise, and by such aproval does not become a party to [it]"

conclusively relieves it of liability under the agreement is unpersuasive. If it is a party through its National Committee, any formal disclaimers are mere ineffectual contrivances.

18. It is to be noted that the International's obligation, like Local 249's, is to undertake the means available to return its members to work. The obligation is not discretionary, but mandatory. Therefore it leaves no latitude for political or even good faith judgments as to what might and what might not be productive. The obligation is literally to employ "every reasonable means" to end "wildcat" strikes.

burgh terminal and urged the men there to return to work. Other officials of the International were dispatched, including Presser to Local 377 and Albert Dietrich and William Neidig to Local 249, to assist the beleaguered local officials and at least Dietrich spoke to the striking members of Local 249 at the meeting of September 15. Two International officers, Walter Shea and Robert Flynn, testified that from the inception of the strikes the International was in contact with officials of the striking locals on almost a daily basis. These largely conciliatory efforts of the International culminated in a meeting at the International's offices in Washington, D. C., on September 17, at which the "riot act" was read to the strikers' leaders.

In light of its obligation, and of the gravity and endurance of the strikes, the International's undertakings to induce the strikers to return to their jobs were veritably negligible. The range of sources of persuasion available to it were fairly vast. Short of placing either of the locals in trusteeship, it could have directly threatened the strikers with fines, suspension or expulsion; it could have proceeded to impose fines, suspensions or expulsions (and have expedited such proceedings); it could have acted sooner in sending International representatives to urge the dissidents to step aside to allow the men to return to work. Further, those representatives who were sent could have urged the return of the men to work in more forceful, uncompromising terms.

Additionally, it could have called a meeting of the leaders of the strikers in its Washington offices far sooner than almost one month after the strikes began, and it could have directed a vote of the strikers by secret ballot. Indeed, it was with the occurrence of these latter two events that the strike was brought to an end. In sum, then, the restraint with which the International went about making efforts to break the strikes, in the face of the urgency of the need for strong, unmistakably intended measures, I think compels the conclusion that the International, like Locals 377 and 249, breached its contractual obligation to the plaintiff to deplete, if necessary, its arsenal of all available means to halt the strikes.

An Order will be entered imposing liability on all three defendants, and the trial of these actions will proceed to the second phase, i.e., that of the issues of damages, including mitigation of damages, if any.