EAZOR EXPRESS, INC., a corporation, Plaintiff,

v.

The INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local Union No. 249, Defendants.

DANIELS MOTOR FREIGHT, INC., and Eazor Express, Inc., Plaintiffs,

v.

LOCAL 377, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Defendants.

Civ. A. Nos. 68–1014, 69–1235.

United States District Court, W. D. Pennsylvania.

June 10, 1974.

Tom P. Monteverde, Pelino, Wasserstrom, Chucas & Monteverde, Philadelphia, Pa., Thomas J. Jackson, Thorp, Reed & Armstrong, Pittsburgh, Pa., for plaintiffs.

Ben Paul Jubelirer, Pittsburgh, Pa., Eugene Green, Green, Schiavoni, Murphy & Stevens, Youngstown, Ohio, Joseph M. Maurizi, Balzarini, Walsh, Conway & Maurizi, Pittsburgh, Pa., Sidney Dickstein, Colson & Shapiro, Washington, D. C., for defendants.

## OPINION

TEITELBAUM, District Judge.

In Eazor Express, Inc. v. Teamsters, et al., 357 F.Supp. 158 (W.D.Pa.1973), I found the defendant local unions and the defendant International liable under Section 301 of the Labor-Management Relations Act (LMRA) (29 U.S.C. § 185 et seq.) for a work stoppage against plaintiff trucking company which lasted from August 20 until September 25, 1968. Although it was specifically found that neither the locals nor the International had authorized or ratified the wildcat strike, the unions were held liable for failing to perform according to their obligation to use all reasonable means at their disposal, both persuasive and punitive, to terminate the work stoppage.[1]

1. In the first Opinion, I declined to premise defendant's liability on a "mass action" theory of union liability for wildcat strikes. See Section 301(e) of the LMRA and U.M.W. v. U. S., 177 F.2d 29 (D.C.Cir.), cert. denied; 338 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535 (1949). In light of the specific contractual provision in the agreement denying union liability for "unauthorized" acts, I felt that to apply the mass action theory "would be to not only negate but rewrite [the collective bargaining agreement's] express provision to the contrary." 357 F.Supp. at 163, n. 7. My reasoning in this regard has been adopted by Judge Edward R. Becker of the Eastern District of Pennsylvania in Adley Express Co. v. Highway Truck Drivers & Helpers Local, 365 F.Supp. 769, 778, n. 8 (E.D.Pa.1973). Once it is understood that the fundamental underlying assumption of the Opinion on liability was regard for what may be called the sanctity of contracts (stated simply, if the union agrees not to strike in a signed contract, it should do everything within its power to prevent or terminate a strike should one occur), my disinclination to rewrite the parties' agreement becomes clear. Nevertheless, it is possible to reconcile the two approaches and view the mass action doctrine as an alternative basis for liability in this case. Recognizing that the seeming conflict between the two approaches turns on the interpretation of the word "authorized", if an authorized strike is interpreted to mean one in which union officials acquiesce and/or one which they fail to terminate by use of the reasonable means at their disposal, the defendants

Such an obligation was implied from the existence of a "no-strike" clause in the collective bargaining agreement between the parties.

The action had been bifurcated as to the issues of liability and damages and the above-cited Opinion dealt only with the issue of liability. In this Opinion, after a lengthy hearing on the question and the submission of briefs by the parties, I consider the issue of damages.

Unlike a jury, which may award damages without substantiation of its reasons for arriving at a certain amount, the district court in such a situation is obliged to set out the rationale behind its damage awards. In such a case as this, where the weeks of testimony were filled with disputes over the intricate mysteries of accounting techniques, to set out in exhaustive detail the step-by-step financial contentions of either side would be a task of Augean [2] dimensions. Rather, I will proceed by setting out those broader principles to which I have adhered in a comprehensive examination of the minutiae of the parties' claims.

■ I recognize that damages, in a case such as this, can neither be proved nor found with precision. The party seeking damages must prove that the conduct which imposes liability upon another was a material cause of injury to the business or property of the claimant. Then, once the fact of injury is established, the trier of fact may make a reasonable estimate of damages. I distinguish between proof of the fact of damages and proof of the amount of damages. It seems to me that any other approach would work an injustice. For a clear and concise expression of this approach in a different context, see the Opinion of Judge Van Dusen in Edward

C. Rea and 22 Ford Inc. v. Ford Motor Co., 497 F.2d 577, Third Circuit Court of Appeals filed April 26, 1974.

■ The fundamental rule to which I have adhered in awarding damages is the basic contract rule of Hadley v. Baxendale, 156 Eng.Rep. 145 (1854): damages are recoverable only for those injuries that may be shown to have been within the contemplation of the defendant as occurring as a probable result of its breach. The foreseeability test is not, of course, to be taken literally: it does not mean that if the defendant contends that he was unable to predict that in the future what did happen would happen, the plaintiff should leave empty-handed. Rather, foreseeability is but a shorthand legal expression for the ascertainment of that *sine qua non* of all legal judgments, proximate cause, by means of hindsight. As stated in Corbin on Contracts, Vol. 5, § 1007, the foreseeability test is "the only substantial test of the legal requirements as to proximate causation and remoteness". Id. at 71.

John Stuart Mill described the cause of an event as the sum total of its antecedents, and in the ultimate, metaphysical sense his axiom is indisputable. But the law, with neither the inclination nor the infinite resources necessary for such weighty contemplations, cannot be concerned with ultimate causes. The very cornerstone of Anglo-American civil law is the principle that no person may recover except for an injury proximately caused by another.

Nor can there be any doubt that foreseeability is the test to be applied in the context of a Section 301 action for damages such as this. As stated in Wilson

---

here are equally and alternatively liable under the mass action doctrine. Admittedly, my original interpretation of "unauthorized" in the collective bargaining agreement assumed that only those acts officially and formally sanctioned by union officials could be authorized, but further analysis leads to the realization that nothing precludes the above interpretation. See in this regard Wagner

Electric Co. v. Local 1104, 361 F.Supp. 647 (E.D.Mo.1973) and the excellent case note at 26 Vand.L.Rev. 1331 (1973).

2. An Augean task is one which is extremely difficult; a task reminiscent of Hercules' labor in cleaning the immense stables of King Augeas of Elis, which had not been cleaned for thirty years.

& Co. v. United Packinghouse Workers, 181 F.Supp. 809 (N.D.Iowa 1960):

"In an action against a union under Section 301 for damages caused by a breach of a no-strike provision in a contract, the measure of damages recoverable is *the actual loss sustained by the plaintiff as a direct result of the breach.* U. E. W. v. Oliver Corp., 8th Cir., 1953, 205 F.2d 376, 388. Such loss would be that which may reasonably and fairly be considered as arising naturally from the particular breach of contract involved *and which may reasonably be supposed to have been in the contemplation of the parties at the time the agreement was entered into . . . .*" Id. at 820–821. (Emphasis added.)

█ In short, because a collective bargaining agreement is a contract and enforceable as such, the traditional criteria for the ascertainment of damages where a contract has been breached— foreseeability and proximate cause—are applicable. Williston on Contracts, (3d ed. 1968) §§ 1020A and 1362.

█ I have taken pains to point this out for two reasons: first, because foreseeability and proximate cause are the fundamental tenets which I have borne in mind throughout my consideration of the question of damages in this case; and second, because repeatedly the parties seem to have lost sight of these principles in making their contentions before the Court. Both sides are equally guilty of this basic misconception of the theory of the lawsuit, but plaintiff's unfounded contention that "this case will not accomplish what it should accomplish unless the finding on liability is accompanied by a substantial damage award" is illustrative. In the first place, it would be plainly improper for this Court or any other to weight its damage award in a Section 301 action in one direction or another on the basis of some public policy it wished to further

or deter. Moreover, what are sought here, as they must be under the terms of the LMRA are compensatory, not punitive damages. Int. Brotherhood of Teamsters v. Morton, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964). This Court has based its damage award on the sole permissible standard for the award of damages in a Section 301 action—foreseeability and proximate cause. The remainder of the Opinion is constructed to exemplify the application of the Hadley v. Baxendale principle to the facts before the Court.[3]

The strike against Eazor took place in the period from August 20 until September 25, 1968. Primarily, it is for losses sustained during this period that plaintiff seeks to recover. For the year 1968 Eazor lost, according to the figures of the Interstate Commerce Commission, $296,000.00. But an analysis of the plaintiff's books and records shows that the company had done fairly well in the first two quarters of 1968, and had in fact made a profit. Thus, the $296,000.00 figure is somewhat misleading, since the loss in the strike period was set off against and reduced by the profit made earlier in the year. Plaintiff submits and this Court finds that during the period August 20 to September 25, 1968, Eazor lost a total of $1,079,332.00. It is this figure which will be used as a starting point for the discussion of plaintiff's losses.

It should be noted at the outset that plaintiff seeks to be compensated for lost profits in this action as well as for the actual losses it sustained. Theoretically, the plaintiff's right to do so is unquestionable. If, in a hypothetical instance, it were to be shown that as the direct result of an illegal strike a company had lost $50,000.00 during a certain period and moreover had been deprived of the $50,000.00 in profits it would have made during that period, the correct measure of damages in such an instance would be $100,000.00. This case

---

3. In accordance with F.R.Civ.P. 52(a), the foregoing shall constitute the Court's findings of fact and conclusions of law in this case.

however does not present such an instance.

This case is comparable to the contrasting hypothetical situation wherein a company, damaged as the result of an illegal strike, demonstrates that it lost $50,000.00 during the period of the strike, but convincing evidence is introduced to show that the company would have lost $25,000.00 during that period under normal business conditions. Clearly, the proper measure of damages in the latter situation would be $25,000.-00 and lost profits would not be includible as an item of compensation.

■■ Here, as in the second example, plaintiff has failed to demonstrate that it would have made a profit during the relevant period and this Court finds that it would not have. Without such conclusive proof, lost profits are not compensable. In addition, plaintiff seeks to recover what it terms "consequential losses". The company seeks to recover for these consequential losses both as a separate item of damages and as an aspect of its lost profits claim. That is, plaintiff contends that the consequential losses primarily took the form of lost business and asks the Court to infer that had that business "lost" been regained, the company would have made a profit. This Court finds that neither aspect of the consequential losses claim is compensable in this case. Plaintiff has failed to carry his burden of proof that (a) the consequential losses for the years 1969 and 1970 were proximately caused by the August/September 1968 work stoppage [4] or (b) that the company would have made a profit, absent the strike, in 1968, 1969 or 1970.

The evidence which is most illustrative of the reasoning behind the Court's findings is the Eazor firm's own language in its reports to its stockholders on a quarterly and annual basis. The Eazor shareholder reports succinctly document the Court's findings. Stated positively, the losses the company sustained in 1969 and 1970 were due to numerous causative factors other than the 1968 strike. Stated negatively, this Court finds that plaintiff has failed to sustain its burden of showing that any losses other than those sustained during August and September of 1968 were caused by the strike.[5]

In the first two quarterly reports for the year 1968, Eazor reported substantial sales increases and in both reports

---

4. A portion of Eazor's one-million dollar plus claim for consequential losses is made up of a claim for $263,702.00 in interest expense. The undeniable remoteness of this item in terms of causation is illustrative of the plaintiff's failure to demonstrate that any portion of its consequential losses claim was caused by the strike. In August of 1970, two years after the strike, Eazor's prime lender refused to extend credit to the company and Eazor was forced to seek out another bank. At the second bank, the company agreed to pay interest at a rate 9% above prime, whereas at the time of the strike its original bank had charged only ½% above prime. It is patently clear that to award the company the interest differential it seeks would be to allow it to recover for the most remote, conjectural and speculative of losses sustained. Simply because a loss occurred after the strike does not necessarily mean it was caused by the strike. Plaintiff has failed to prove which, if any, post-strike losses were caused by the strike.

5. The findings that (1) no loss incurred after the end of calendar year 1968 is attributable to the strike and that (2) the losses sustained by Eazor during 1969 and 1970 were due to numerous causative factors are further borne out by Eazor's own statements in a brief submitted to the Internal Revenue Service in the summer of 1970:

"While Eazor Express, Inc. showed increasing profits for many years, it must be made quite clear that this trend peaked out in 1965 . . . [T]here had been a *drastic downward trend in earnings starting in 1966.* . . . The point we are trying to make here is that Eazor's ability to generate profits began to deteriorate well before [October 1967].

In fact, following the trend through, *we are certain that Eazor . . . would have experienced a sizeable loss in 1968 even without the burden of the strike in the fall* of that year, and had Daniels not been acquired." (Emphasis added.)

expressly attributed this auspicious financial development to the integration of their operations with those of the recently acquired Daniels Motor Freight Company. The quarterly report for the three-month period ending September 30, 1968, the period which included the work stoppage, reads in relevant part as follows:

"TO OUR FELLOW STOCKHOLDERS:

Sales in the third quarter of this year increased $1,441.109 and in the first nine months $10,822,363. This increase is attributed to the acquisition of Daniels Motor Freight Inc., plus growth in our other areas.

Unfortunately we suffered an illegal strike lasting from August 20th to September 25th which started with our Daniels drivers and was very costly to your company, resulting in a deficit of $722,516 for the third quarter and $552,507 for the nine months.

In order to protect our stockholders, our customers and our employees from possible recurrent, unauthorized work stoppages at any interval in the future, *we could not settle grievances by any procedure other than the procedure in the union contract and we did not. . . .*[6]

Through the courts we were successful in obtaining injunctions and restraining orders against picketing. Prior to the strike we had two breakbulk terminals, one at Daniels at Warren, Ohio and the other at Eazor Express, Pittsburgh where miscellaneous shipments were reloaded on trailers going to ultimate destination terminals. It was our intent to gradually phase out Warren both as an economy move and to improve service to our customers. The illegal strike hastened this and Warren is now closed, eliminating the lengthy delay of going through the various steps in the contract. . . . [7] We will not tolerate unauthorized strikes and we believe the closing of the Warren terminal will eliminate this problem in the future.

*Our operations quickly returned to normal when we went back to work and we have regained all of our customers. . . .* "[8]

The 1968 annual report essentially repeats the above assertions in less detail, without contradiction of anything in the 1968 third quarter report. The first quarter report for the period ending March 31, 1969, the fiscal period immediately following the strike, reads in pertinent part as follows:

"TO OUR FELLOW STOCKHOLDERS:

Sales in the first three months of 1969 decreased $625,276 over the same period last year due to the serious decline in our traffic caused by the east coast pier strike. Severe winter weather in the New England, New York and New Jersey areas also contributed to this unfavorable showing. Some roads were impassable, seriously affecting our operations, and one of our terminals had to remain closed for a few days until snow could be cleared from roads in the area. . . . "

Significantly, the August/September 1968 work stoppage is not even men-

---

6. See pp. 849–851, *infra.*

7. This statement is illustrative of a point fully substantiated in the record that, contrary to plaintiff's assertions, the effects of the strike were not solely deleterious but, as in this instance, beneficial, resulting in financial and operating benefits to the company.

8. This statement is of course directly contrary to plaintiff's attempted assertion that it not only lost business as a result of the strike but lost such business irrevocably. Eazor presented one witness in this regard whose testimony was inconclusive at best. I find expressly that plaintiff did not lose business and/or profits as a result of the strike. See pp. 7–8, *supra.*

tioned as a cause of the loss occasioned during the first post-strike fiscal period. Nor is any mention made of any continuing after-effects of the strike in any Eazor shareholder report thereafter except for that in the September 30, 1969 quarterly report when the results for the two years are compared, and that in the 1969 annual report where the 1968 strike is listed along with the tight money market, rising interest rates and equipment defects as *one of* the causes for the firm's loss in that year. Plaintiff's own stockholders' reports substantiate this Court's finding that no loss incurred by Eazor after the end of calendar year 1968 has been shown by a fair preponderance of the evidence to be attributable to the strike.

## STARTING POINT FOR DAMAGES

■ As stated above, the $1,079,332.-00 figure provides the starting point for the Court in its computation of damages. The problem with computing damages in a Section 301 action, as any district court judge who has wrestled with the problem will attest, is simply that damages in such a context are not susceptible of proof with mathematical exactitude. By the same token, neither are they susceptible of disproof with precision. The court is left to fashion a damage award according to its sound judgment after application of the relevant legal principles. The difficulty of this process is highlighted when two specific problems—the starting date of defendants' liability and mitigation of damages are discussed. The liability of the defendant unions was based primarily [9] upon the failure of Locals 377 and 249 and the International to deplete their "arsenal of all available means to halt the strikes". 357 F.Supp. at 169. Defendants argue, with persuasive effect, that a necessary correlate of this basis of liability is that there must be some time lag between the inception of the strike and the point at which they were called upon (and failed) to exert

all reasonable efforts to end the strike. I agree. The primary basis for defendants' liability is therefore amplified to recognize the obvious fact that the leaders of the three defendant unions could not have been required to bring forth their most potent weapons immediately upon notification of the strike. In such a situation it is reasonable to assume, as the union defendants no doubt did assume at the time, that the "persuasive" measures taken upon being notified of the outbreak of the strike (informing the strikers of the illegality of the walkout and urging them, without calling into play effective sanctions, to return to work) would be effective in ending the strike. Thereafter, a certain period of time, which the Court is willing to set in this fact situation but which it does not wish to have interpreted as an ironclad rule under all circumstances, must be allowed to pass in order to permit union leaders to ascertain whether or not their diplomacy has been effective. When the point is reached where it would become obvious to reasonable men that their persuasive efforts had failed, then defendants were required to escalate their response to include those more forceful actions listed in the previous Opinion.

■ Having recognized that a differentiation should exist between the start of the strike and the beginning of defendants' liability, it becomes necessary to resolve two problems which arise as a result of that decision. The first question is whether, under this state of facts, there is any difference as between the three defendant unions as to the starting point of liability. Analysis of the Court's findings of fact as to when each respective union entity was informed of the wildcat strike and as to when each began to take action (357 F. Supp. at 165–169) establishes that the answer to this question must be no. The latest that any union official with responsibility in this matter learned of

---

9. See footnote 1, *supra.*

the strike was the morning of August 21, 1968, picket lines having been established the previous day. Thereupon, the actions taken almost immediately by the officials of Local 377 and Local 249 and by officials of the International were virtually indistinguishable. Each entity informed those within its charge of the illegality of their action and urged the men to return to work. Within a certain period of time it was, or should have been, patently obvious to officials of each of the union entities that resort to "the politics of persuasion" had been unavailing.

█ The second problem is ascertainment of the length of time in which it should have become obvious that halfway measures had failed. I have inferred such a time period from the evidence on the record. Since I am aware that such a time differential must be expressed in mathematical terms in order to facilitate the formulation of damages, I have determined that, under the facts of this case, such a period extended for forty-eight hours.[10] Assuming that each day of the 36-day strike accounted for a proportionate increase in damages, I have reduced the measure of damages accordingly.

## MITIGATION OF DAMAGES

█ According to the Restatement of Contracts, § 336:

> "Damages are not recoverable for harm that the plaintiff should have foreseen and could have avoided by reasonable effort without undue risk, expense, or humiliation."

In keeping with this fundamental principle of contract law, once a breach

of the contract, the strike, occurred, Eazor had an obligation to take reasonable steps to mitigate damages flowing from the breach and to refrain from any action which would aggravate an already exacerbated situation and increase the measure of damages. Williston on Contracts, (3d ed. 1968), § 1353. This Court finds that Eazor did not comport itself in accordance with that legal standard and therefore reduces the measure of damages accordingly.

Bearing in mind that in a hard-nosed business, a hard-nosed attitude on the part of management is often thought necessary, this Court cannot sanction Eazor's behavior in failing to take any effective steps whatsoever to hasten an end to the strike. A tough-minded attitude toward labor negotiations is one thing; the complete absence of any evidence of a flexible spirit of conciliation and compromise is quite another. The evidence shows that once a strike had gone on for some time, Eazor failed to exhibit even that modicum of reasonableness necessary for achieving labor peace.

On September 3, 1968, when the strike had been in effect for two weeks, representatives of the unions met with Eazor representatives in an effort to settle the strike. The September 3 meeting was held at the urging of the Honorable Thomas D. Lambros, United States District Judge for the Northern District of Ohio. The unions sought to have the striking employees return to work and to submit to arbitration the question of whether Roper and Eckley, the strike leaders whose discharge had triggered the strike, had been properly discharged, along with the underlying questions of

---

10. The risk which arises from traveling such a course is that setting of a specific time period will be taken for something other than what it is, an inference drawn from the exhibited actions of defendants under all the facts and circumstances of this specific case. The risk is that it will be taken for a rule which states that if, within 48 hours after the start of the strike, the first efforts of union officials to end an unauthorized work stoppage have not borne fruit, those officials

who fail to take more forceful measures to end the strike will be held liable in damages. Nothing could be further from my mind than setting such a rule. The conduct of human affairs in general, and labor relations in particular, are not activities which may be divided into segments, computerized and set out onto timetables. Individual judgment by responsible leaders and the freedom of those in authority to pursue reasonable alternative courses of action must be preserved.

work rules and conditions. Eazor took the position that the fate of the discharged employees was non-negotiable until all employees who had not been discharged [11] returned to work. Thereafter, the situation deteriorated and the strike continued for three more weeks.

On September 9, Eazor discharged five more employees, the shop stewards and committeemen of Local 249. On that same date, Eazor proposed that all remaining employees, not including those it proposed to put on a three-month suspension, return to work with the same condition attached—that the status of discharged employees was final and not subject to arbitration. The unions refused to accept this solution. On September 17, Eazor discharged seventeen more Local 377 employee members and permanently closed its Warren terminal.

This scenario is not meant to stand as a blanket condemnation of Eazor's bargaining stance which in and of itself amounts to a failure to mitigate damages. As stated in In Re Kellett Aircraft, 186 F.2d 197 (3d Cir. 1950):

> "Whether or not the buyer's obligation to mitigate damages has been discharged depends on the reasonableness of its conduct. In this connection, reasonable conduct is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the problem was presented. Where a choice has been required between two reasonable courses, the person whose wrong forced the choice cannot complain that one rather than the other was chosen. The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have

been more advantageous to the defaulter. One is not obligated to exalt the interests of the defaulter to his own probable detriment." Id. at 198–199.

This Court finds, under all the facts and circumstances of this case, that plaintiff failed to mitigate damages. Such a finding does not center solely upon plaintiff's discharge of striking employees, for plaintiff's rights in that regard are specifically defined in the law (see N.L.R.B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938)) and in the contract between the parties. On the other hand, it must be noted that Eazor's continued adherence to a hard-line course of retribution and obstinacy might well have been foreseen to achieve nothing more than what it did achieve —a strengthening of the feeling of solidarity which already motivated the workers.

Nor does the finding of failure to mitigate damages center solely upon Eazor's refusal to accept the unions' September 3 settlement proposal. As pointed out in In Re Kellett Aircraft, no one can say with certainty, even in hindsight, what course of action was best for plaintiff's interests at the time. But it can be said with certainty, and this Court so finds, that acceptance of the unions' September 3 settlement proposal and/or refraining from discharging any or all striking employees would have been reasonable efforts on plaintiff's part which would not have caused plaintiff undue risk, expense or humiliation. Once the strike had been ongoing for some time, it was the responsibility of *both* parties to earnestly seek resolution of their difficulties.

 In addition to the reduction in damages for failure to mitigate damages and in keeping with setting a reasonable starting point for damages, there is one specific item of damages which plaintiff has failed to prove was

---

11. On August 22nd and 23rd, twenty-six Eazor employees had been discharged for their

participation in the unauthorized work stoppage.

proximately caused by the strike, and thus an item for which he may not be compensated—legal expense. In computing its estimate of Eazor's operating loss for August/September 1968, plaintiff includes an item for $52,108.00 in legal expenses. While it is true that legal expenses which directly relate to terminating a work stoppage, as opposed to those which relate to seeking damages sustained as a consequence of such work stoppage, are recoverable (Sheet Metal Workers, Local 223 v. Atlas Sheet Metal Co., 384 F.2d 101, 110 (9th Cir. 1967)), plaintiff has failed to sustain its burden of proving what portion, if any, of the legal expenses it incurred were directly related to ending the strike. To base an award of attorney's fees in a Section 301 action upon plaintiff's unsubstantiated submission of its bills from counsel would be impermissible speculation.

Thus, starting from a base of $1,079,332.00, the demonstrated loss for August and September of 1968, I subtract $52,108.00, to yield a figure of $1,027,224.00. Next, the amount of damages attributable to that initial period during which defendants' duty to exhaust all reasonable efforts toward ending the strike had not yet been activated must be subtracted. Assuming that defendants' duty was not activated until a maximum period of 48 hours had passed, the amount to be subtracted may be expressed as $2/36$ of the whole, since the work stoppage lasted a total of 36 days. Expressed as a percentage, $2/36$ equals .056. Thus, subtracting $57,524.54 (.056 x $1,027,224.00) from the total damages mathematically accounts for that period in which defendants' duty to exhaust all reasonable efforts had not yet arisen. The result of such computation yields damages in the amount of $969,699.46.

I find that only .528 of the above figure or $512,001.32 is due plaintiff as compensatory damages. This proportion is arrived at by taking September 9, 1968, the date on which plaintiff responded to defendants' settlement offer, as the final point for plaintiff's damages. On September 9, the strike was 19 days old and .528 is the percentage expression of $19/36$. After September 9, 1968, I find that plaintiff's failure to mitigate damages was the cause of any harm done to the company.

I find further, on the basis of the percentage breakdowns submitted by plaintiff, that Local 249 is liable for 63.5% of this amount or $325,120.84, and that Local 377 is liable for 36.5% of the total or $186,880.48. These figures reflect the proportion of damage incurred by Eazor and Daniels respectively, considered as separate entities, as a result of the strike. Since there are two separate contracts involved in this case, one between Eazor and Local 249 plus the International and one between Daniels and Local 377 plus the International, neither local can incur liability for breach of the other local's contract. Thus, Local 249 is liable only for damages caused by breach of the contract with Eazor and Local 377 is liable only for damages caused by its breach of the contract with Daniels.

The International of course was under contractual agreement with both Daniels and Eazor simultaneously and has been found, in the Opinion on liability, to have been in breach of its contractual obligations. The International and Local 249 were bound jointly on the contract with Eazor and the International was bound jointly with Local 377 on the contract with Daniels. Thus, the International's liability for $512,001.32 is joint and several with that of the two locals.

An appropriate Order in accordance with this Opinion shall be entered.